1  Robert F. Scoular (SBN 085293)
   robert.scoular@snrdenton.com
2  Andrew Z. Edelstein (SBN 218023)
   andrew.edelstein@snrdenton.com
3  SNR DENTON US LLP
   601 South Figueroa Street, Suite 2500
4  Los Angeles, California 90017-5704
   Telephone: (213) 623-9300
5  Facsimile: (213) 623-9924

6  Charles A. Newman (*Pro Hac Vice*)
   charles.newman@snrdenton.com
7  Michael J. Duvall (*Pro Hac Vice*)
   michael.duvall@snrdenton.com
8  SNR DENTON US LLP
   211 North Broadway, Suite 3000
9  St. Louis, Missouri 63102
   Telephone: (314) 241-1800
10 Facsimile: (314) 259-5959

11 Margo Weinstein (*Pro Hac Vice*)
   margo.weinstein@snrdenton.com
12 SNR DENTON US LLP
   233 South Wacker Drive, Suite 7800
13 Chicago, Illinois 60606
   Telephone: (312) 876-8000
14 Facsimile: (312) 876-7934

15 Attorneys for Defendants
   FIRST AMERICAN FINANCIAL CORPORATION and
16 FIRST AMERICAN TITLE INSURANCE COMPANY

17              UNITED STATES DISTRICT COURT

18              CENTRAL DISTRICT OF CALIFORNIA

19

20 DENISE P. EDWARDS, individually        No. CV07-03796 SJO (FFMx)
   and on behalf of all other similarly
21 situated,                             DECLARATION OF CRAIG W. SYBY
                                         REGARDING TOWER CITY TITLE
22              Plaintiff,               AGENCY LLC IN SUPPORT OF
                                         DEFENDANTS' MOTION TO
23      vs.                              DECERTIFY THE TOWER CITY
                                         (OHIO) CLASS
24 FIRST AMERICAN FINANCIAL
   CORPORATION and FIRST
25 AMERICAN TITLE INSURANCE
   COMPANY,                              Hearing Date: May 23, 2011
26                                       Time:         10:00 a.m.
                Defendants.
27

28

SNR DENTON US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

---

## DECLARATION OF CRAIG W. SYBY

I, Craig W. Syby, declare:

1.     I make this Declaration in support of Defendants' Motion to Decertify Tower City (Ohio) Class in the above matter.  Unless otherwise stated, I have personal knowledge of the facts stated herein based on my own personal experience and my review of business records identified in this Declaration, and, if called upon to do so, I could and would competently testify thereto, under oath.

2.     I am an attorney admitted to practice by the Supreme Court of Ohio in 1993 and am a member in good standing of the Ohio bar.

3.     Between May 1995 and July 2007, I was General Counsel for Tower City Title Agency, LLC ("Tower City"), a former title agency located in Highland Heights, Ohio.  I have over 17 years of experience in the title industry in Ohio, including performing title examinations and evaluations, clearing defects in title such as liens and encumbrances, proofing, interpreting, and receiving commitments for title insurance, making insurability determinations in cooperation with title insurance underwriters, working with said title companies' closing and escrow departments, handling title claims and litigation (often in conjunction with title insurance underwriters), and performing licensing and compliance functions for Tower City.

4.     As General Counsel for Tower City, I worked closely with other departments of Tower City, including the title order, commitment, closing, policy, and escrow departments, and advised and assisted those departments with respect to title insurance underwriting, policy issuance, claims, regulatory, and compliance matters.

5.     From approximately 1994 until August 6, 2007, Tower City was an authorized agent for and sold title insurance policies underwritten by First American Title Insurance Company ("FATIC").  A true and correct copy of Tower City's Ohio November 1, 1998 Agency Agreement with First American, which is true and correct copy of a business record made and maintained by Tower City in the ordinary course

SNR DENTON US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

-1-

1   of its business at or near the time of the matters described therein, is attached to this

2   Declaration as Exhibit A.

3        6.    Under Tower City's November 1, 1998 Ohio Agency Agreement with

4   FATIC, Tower City was "an agent of . . . First American for the transaction of

5   [FATIC's] title insurance business which [Tower City] agree[d] to promote and

6   perform exclusively for . . . First American in all counties in Ohio." Ex. A ¶ 1.

7   However, "[n]otwithstanding such exclusivity and as an exception therefrom, [Tower

8   City] [was] permitted to:  (i) enter into an agency agreement with Stewart Title

9   Insurance Co., which is substantially identical with the agreement currently with

10   Tower City Title Agency, Inc. . . . and (ii) enter into agency agreements with certain

11   other underwriters when a particular customer (or customers) require the use of only

12   that certain other underwriter (or underwriters)." Ex. A ¶ 1.

13        7.    On November 9, 2006, Tower City's Ohio Agency Agreement with

14   FATIC was amended to remove the above-quoted clause.   A true and correct  copy

15   of Tower City's November 9, 2006 Ohio Agency Agreement with First American,

16   which is true and correct copy of a business record made and maintained by Tower

17   City in the ordinary course of its business at or near the time of the matters described

18   therein, is attached to this Declaration as Exhibit B.

19        8.    While Tower City was authorized to issue policies for Stewart Title as

20   well as for FATIC under the 1998 Ohio Agency Agreement, Tower City issued fewer

21   policies for Stewart Title in 2006, in significant part because Stewart gradually

22   reduced its presence in Ohio with respect to underwriting and claims assistance.

23        9.    During the time the 1998 Ohio Agency Agreement was in effect, Tower

24   City also issued title insurance policies underwritten by other underwriters, and, by

25   2006, a significant number of title insurance policies issued by Tower City were

26   underwritten by Old Republic National Title Insurance Company ("Old Republic").

27

28

SNR DENTON US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

-2-

DECLARATION OF CRAIG W. SYBY REGARDING TOWER CITY TITLE AGENCY LLC IN SUPPORT OF
DEFENDANTS' MOTION TO DECERTIFY THE TOWER CITY (OHIO) CLASS

10.     Throughout its agency relationship with FATIC, including from June 12, 2006 through November 9, 2006, Tower City never sold only FATIC policies in Ohio.

11.     From June 12, 2006 through November 9, 2006, when Tower City performed title services (*i.e.*, any service involved in the provision of title insurance, including, but not limited to, title examination and evaluation, preparation and issuance of the title commitment, clearance of underwriting objections, preparation and issuance of the title insurance policy, and processing and administrative services required to perform these functions) as an agent of FATIC, it did so under the terms of the 1998 Ohio Agency Agreement.  Tower City prepared and issued the FATIC title insurance policy on behalf of the insurer, FATIC, and remitted to FATIC its portion of the policy premium.

12.     Under the 1998 Ohio Agency Agreement, Tower City was authorized to issue FATIC policies without transaction-specific approval from First American, except in extraordinary transactions requiring prior approval; *i.e.*, risks in excess of $1,000,000, risks involving title with known disputes among lawyers, risks involving title with adverse claims, and extraordinary risks set forth in FATIC's rules, instructions, or manuals. Ex. A ¶ 5.B. Pursuant to this authority, FATIC provided Tower City with policy forms that Tower City was authorized to execute and issue on behalf of FATIC, thereby binding it as the insured on the policies. Ex. A ¶ 6.A. Tower City typically notified FATIC of the issuance of a title insurance policy approximately one month after Tower City issued the policy. Ex. A. ¶ 7.

13.     Tower City disclosed its relationship with FATIC.  For instance, throughout 2006, Tower City listed FATIC as an "Affiliate" on its website.  A fair and accurate representation of Tower City's website's "Affiliations" page as it appeared in 2006 is attached to this Declaration as Exhibit C.  During this time, Tower City's website also disclosed its "affiliation with First American Title Insurance Co." in the "About Us" section.   A fair and accurate representation of

SNR DENTON US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

-3-

DECLARATION OF CRAIG W. SYBY REGARDING TOWER CITY TITLE AGENCY LLC IN SUPPORT OF
DEFENDANTS' MOTION TO DECERTIFY THE TOWER CITY (OHIO) CLASS

1   Tower City's website's "About Us" page as it appeared in 2006 is attached to this

2   Declaration as Exhibit D.

3       14.    Also throughout 2006, Tower City's Ohio office displayed FATIC's logo

4   on its window, visible to persons entering the agency; *e.g.*, buyers, sellers, or

5   borrowers who were closing on their real estate transactions.

6       15.    Throughout its history, Tower City performed settlement and title

7   services, including issuing title insurance for underwriters like FATIC, in residential

8   and commercial real estate transactions. In 2006, Tower City issued FATIC title

9   insurance policies in real estate transactions primarily involving residential, one-to-

10  four family property but also in some transactions involving commercial property.

11      16.    When Tower City closed a real estate transaction, Tower City did not

12  review or analyze whether the borrower's primary purpose for the loan was a

13  business purpose (*e.g.*, to start, expand, or improve a business, including a home

14  office); rather, that determination was the lender's, not Tower City's, to make.

15      17.    When Tower City closed the real estate transactions described above, it

16  always used a HUD-1 Settlement Statement ("HUD-1"). However, the HUD-1 does

17  not indicate whether the:

18          A.    Property involved is residential (one-to-four family), vacant, 25+

19              acres, agricultural, or commercial;

20          B.    Lender is federally insured; or

21          C.    Lender originated more than $1 million in residential mortgage

22              loans per year.

23      18.    Tower City did not have possession, custody, or control, or maintain a

24  copy of, a lender's "loan file" for real estate transactions in which Tower City

25  performed settlement and title services.

26

27

28

SNR DENTON US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

-4-

I declare under penalty of perjury, under 28 U.S.C. § 1746, that the foregoing is true and correct.  Executed on the _____ day of April, 2011.

_____
Craig W. Syby

SNR DENTON US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

-5-

DECLARATION OF CRAIG W. SYBY REGARDING TOWER CITY TITLE AGENCY LLC IN SUPPORT OF DEFENDANTS' MOTION TO DECERTIFY THE TOWER CITY (OHIO) CLASS

EXHIBIT  A

#472

HAGREEMENTONTOWERCTV.AGR
October 13, 1998

## AGENCY AGREEMENT

This Agreement, by and among MIDLAND TITLE SECURITY, INC., an Ohio corporation, whose address is 1360 East 9th Street, IMG Center, Cleveland, Ohio 44114 ("Midland"), and Tower City Title Agency, L.L.C. and Marilyn Mannarino, whose address is 6151 Wilson Mills Road, Highland Heights, Ohio 44143 (each an "Agent"), agree as follows:

1. **Appointment.** Midland, as general agent of and for First American Title Insurance Company of California ("First American"), in the exercise of its authority to appoint agents on behalf of First American with respect to the transaction of the business of title insurance in the state of Ohio, hereby appoints Agent an agent of Midland and/or First American for the transaction of Midland's title insurance business which Agent agrees to promote and perform exclusively for Midland and/or First American in all counties in Ohio. Notwithstanding such exclusivity and as an exception therefrom, Agent shall be permitted to: (i) enter into an agency agreement with Stewart Title Insurance Co., which is substantially identical with the agreement currently with Tower City Title Agency, Inc., so long as Agent does not write policies aggregating premium remittances to Stewart Title which are significantly more than the minimum premium remittances Stewart Title currently requires of its agents to maintain its agency contracts and, (ii) enter into agency agreements with certain other underwriters when a particular customer (or customers) require the use of only that certain other underwriter (or underwriters) as a condition to doing business with such customer (or customers) and First American would not be acceptable to such customer (or customers), provided that the foregoing shall be strictly construed and intended to permit the use of another underwriter only when the alternative would be a direct loss of business to Agent. The "business of title insurance", as used herein, means rendering any or all of the following services to any legal person in consideration of the payment of a fee:

    A. Receiving and processing applications for title commitments, title guarantees, judicial reports, guaranteed certificates of title, title insurance policies, endorsements, or other forms of title evidence approved by First American (the "Approved Title Evidence");

    B. Examining the chain of title to real estate in connection with the issuance of the Approved Title Evidences; and

    C. Issuing the Approved Title Evidences in accordance with the terms and provisions of this Agency Agreement.

2. **Authority.** Agent may sign, countersign, and issue commitments, title guaranties and insurance policies, endorsements and other forms of title evidence authorized by Midland and/or First American (herein sometimes referred to as "title evidence" or "premium-bearing forms"), on real estate located in the county or counties referred to above, and in such other counties as may be designated by Midland and/or First American.

CONFIDENTIAL

Defs-Edwards_0037163

Exhibit A
Page 6

3. **Agent's Obligations.** Agent shall:

A. Take all reasonable steps to solicit title insurance business and to promote the use of title insurance in the area in which Agent does business.

B. Receive and process applications for title insurance in accordance with the usual and customary practices and procedures of responsible title insurance agencies in the conduct of their business in a prudent, safe, sound, and ethical manner in accordance with recognized title underwriting principles and the rules, regulations and instructions of Midland and/or First American. The determination of the insurability of any title, subject to the provisions of Section 5., shall be based upon one or more of the following:

(1) A search by Agent of all relevant public records.

(2) An examination of the abstract of title prepared and certified by Agent or by another recognized abstracter whose work is accepted by prudent local title examiners and whose work shows all relevant public records.

(3) An examination of Agent's indices and records supplemented to the extent necessary by an abstract or search of the relevant public records.

(4) Title reports or opinions, on forms furnished or approved by Midland and/or First American, by examiners approved by Midland and/or First American.

C. Preserve in its possession all supporting documents on which the determination of insurability is made, including, but not limited to, affidavits, lien waivers, searches, and work sheets; and provide Midland and/or First American with access to said documents at any reasonable time or times.

D. Assume full responsibility for the collection of all premiums due in accordance with the rates established in Paragraph 7 of this Agreement for properties located in the state of Ohio and pay to Midland and/or First American the share of such premium due Midland and/or First American on or before the 15th day of the month succeeding that in which the premium-bearing form was issued. Each payment to Midland and/or First American shall be accompanied by a copy of each premium-bearing form issued during the period covered by the remittance.

E. Keep a policy register in a form approved by Midland and/or First American in which the Agent shall enter a record of and show the disposition of all

2

Defs-Edwards_0037164

Exhibit A
Page 7

policies, endorsements and other contracts under which Midland and/or First American assumes liability for the condition of title. The Agent shall be liable in damages for any loss resulting to Midland and/or First American by reason of the loss or wrongful use of any premium-bearing forms.

F.   Keep safely and segregated in a bank account all monies that may be entrusted to Agent in the course of Agent's operations hereunder, and keep safely any property so entrusted to Agent. Any funds or property deposited with Agent as security for the disposition of or affirmative insurance with respect to a matter that would be included in Schedule "B" of the policy, shall be transferred to Midland and/or First American on or before the 10th day of the month succeeding that in which it was received, together with a copy of the agreement or other documentation pursuant to which the funds or property were received, and such funds or property are to be retained by and under the control of Midland and/or First American in the same manner as similar funds or property held by Midland and/or First American pending disposition pursuant to the agreement under which it was received.

G.   Make available at all reasonable times for examination and audit by Midland and/or First American all accounts, books, ledgers, searches, abstracts and other records of Agent relating to the title insurance business carried on by Agent for Midland and/or First American.

H.   Agent agrees it will maintain all of its accounts and financial transactions in accordance with procedures acceptable by state law, and generally accepted accounting procedures.

I.   Agent agrees it will timely provide a balance sheet and profit and loss statement annually prepared by a certified public accountant but in no event any later than 90 days after the close of the calendar year or fiscal year, as applicable.

J.   Agent shall carry at its own expense title insurance agent's errors and omissions liability insurance in a principal sum not less than $250,000.00 issued by a company or companies acceptable to Midland and/or First American and furnish Midland and/or First American with current premium receipts. Agent shall be liable to pay all amounts, including attorney fees, up to and including the first Twenty-Five Hundred Dollars ($2,500.00) of each loss arising on any one title evidence or premium-bearing form issued by Agent, provided any loss is attributed as a direct result of the negligence or misconduct of the agent or its employees or independent contractors. Liability of Agent for such sum or sums as it may become liable to pay hereunder shall not end upon the termination of this Agreement but shall continue for as long as any title evidence or premium-bearing form issued by Agent remains in force.

3

Defs-Edwards_0037165

Exhibit A
Page 8

4.  No Agency For Escrow or Closing.  It is understood and agreed that Agent is not an agent of Midland and/or First American for the transaction of escrow or closing business and Midland and/or First American expressly deny liability for Agent's conduct of such business.  Agent recognizes, however, that claims for liability resulting from Agent's conduct of such business might nevertheless be asserted against Midland and/or First American and, in an effort to minimize such risk, Agent agrees to adhere in its conduct of any such business to Midland's' instructions for the operation of the Midland branch offices engaged in such escrow or closing functions.  Agent agrees to keep safely and segregated in separate bank accounts all monies entrusted to it in the course of its escrow or closing business and to make available at all reasonable times for examination and audit by Midland and/or First American all accounts, books, ledgers, files and other records of Agent relating to its escrow or closing business.

Although any escrow business conducted by Agent is not within the scope of this Agreement, Midland and/or First American may from time to time, as an accommodation to Agent in the promotion of Agent's title insurance agency business, issue a "closing protection letter" to a prospective insured or other party to a real estate transaction being processed by Agent, the effect of which is to bind Midland and/or First American to indemnify the addressee thereof against certain losses resulting from Agent's errors, omissions or misconduct in acting as escrow agent for the parties to the transaction, all in accordance with the terms and conditions stated in such letter.  In the event Midland and/or First American makes payment of a claim arising out of the conduct of Agent's escrow business (whether or not based on such letter of indemnity) either as a result of entry of judgment against Midland and/or First American or as a result of compromise and settlement, Agent shall promptly reimburse Midland for the full amount of Midland's and/or First American's expenditures, including attorney fees and costs of litigation or settlement negotiations.

Agent agrees that at any reasonable time or times during the terms of this Agreement, it will permit examination by Midland and/or First American of all accounts, books, ledgers, tax returns and other financial and business records relating to the title insurance business conducted by Agent for Midland and/or First American.  The parties hereto agree that the manner of operation of any escrow business by Agent is a legitimate concern of Midland and/or First American because of issuance by Midland and/or First American of "closing protection letters" and because of quality of such services performed by Agent bears on the Agent's continuing ability to generate title insurance business on behalf of Midland and/or First American.  Agent, therefore, agrees that although the Agent's escrow business is outside the scope of the agency relationship created by this Agreement, Midland and/or First American shall be permitted at any reasonable time or times to examine all financial and business records relating to any escrow business conducted by Agent.

5.  Prohibitions.  Agent shall not, without written approval of Midland and/or First American:

A.  Incur debts in the name of Midland and/or First American; admit, deny or adjust any claim for loss; or accept service of process on behalf of Midland and/or First American.

4

CONFIDENTIAL

Defs-Edwards_0037166

Exhibit A
Page 9

B.   Commit Midland and/or First American to: (1) a risk in excess of $1,000,000.00; (2) a risk involving a title where Agent has knowledge that a dispute exists among lawyers; (3) a risk where Agent has knowledge of risks, adverse claims or questions of title known in the community; (4) any extraordinary risk as set forth in Midland and/or First American's rules, instructions or manuals. All such titles, together with the supporting abstracts, certificates of title, chain of title (if no abstract is furnished) searches, and a statement of the special question involved, if any, shall be submitted to Midland and/or First American for consideration before Agent incurs any liability on behalf of Midland and/or First American.

C.   Commit Midland and/or First American to any interpretation of the printed terms of any document.

D.   Accept or agree to accept any holdbacks, hold harmless agreements or indemnity agreements, whether secured or unsecured, as a basis for affirmatively insuring over, or omitting from a policy, any title risk or exception.

E.   Alter forms furnished by Midland and/or First American.

F.   Accept an application for title insurance for an amount less than the approximate value of the premises involved in the case of an owner's policy, or for less than the amount of the indebtedness in the case of a lender's policy, or otherwise vary from the applicable rates established by Midland and/or First American from time to time.

G.   Accept service of legal process on behalf of Midland and/or First American, unless required by state law, in which event Agent shall immediately forward to Midland and/or First American all documents served.

H.   Request Midland and/or First American to issue its title policy or other indicia of title insurance provided for herein knowing it, Agent, at that time is in default or otherwise negligent in the performance of any of its obligations and agreements contained herein.

6.   **Midland's and/or First American's Obligations.**   Midland and/or First American shall:

A.   Furnish the Agent with all commitments, policies, endorsements and other contracts under which First American assumes liability for the condition of title.

B.   Determine all questions of risk submitted by the Agent.

5

CONFIDENTIAL

Defs-Edwards_0037167

Exhibit A
Page 10

C. Provide for reinsurance when necessary.

D. Appoint Agent in writing as a validating officer to countersign the forms issued to Agent.

7. **Compensation and Remittance.** Agent agrees to be responsible for the collection of all premiums for Title evidence issued by Agent in accordance with the then effective schedule of rates as filed with the Ohio Department of Insurance by First American and shall retain _____ as its commission on all premiums written. The balance of said premiums shall be remitted to Midland and/or First American no later than the 15th of the month following the month in which such premiums are written. All remittances not received by Midland and/or First American within sixty (60) days from the date on which such remittances are due shall automatically accrue interest at a rate equal to two percent (2%) per annum above the Prime Rate of National City Bank, Cleveland, Ohio, in effect from time-to-time, until paid. Agent shall forward to Midland and/or First American with each monthly report and remittance a copy of each form of Title Evidence referred to therein. Midland and/or First American retains the right to revise the remittance date and/or schedule rates, whereupon the remittance schedule shall be altered accordingly; provided, however, that no increase in rates shall apply to applications for title insurance or other contracts pending in Agent's office at the effective date of such revision nor shall any revision alter Agent's right to compensation already earned.

If the current annual tax, gross premium tax or State Income Tax rate, as applicable, shall be increased, or should a tax or assessment in addition, substitution or in lieu thereof be imposed on Midland and/or First American, either by constitutional amendment, legislative act or otherwise and should said tax or assessment be higher than the tax as presently paid by Midland and/or First American, the Agent and Midland and/or First American shall, in good faith, renegotiate the percentage of gross premiums paid to First American hereunder.

In the event that the parties cannot, after good faith negotiations, come to any agreement, then Midland and/or First American shall have the option to terminate this Agreement by giving 60 days written notice to Agent in accordance with paragraph 11 (A) (2) following.

8. **Reinsurance and Coinsurance: Extra Hazardous Risks.** Midland and/or First American shall have sole discretion as to whether any particular risk shall be reinsured or coinsured by another title insurance company. If any risk is reinsured or coinsured, Agent's compensation shall be computed on the basis of the net amount remaining after taking into account the cost of such reinsurance or coinsurance year Agent will not be entitled to any portion of any premium paid for reinsurance or coinsurance, or any additional premium charged by Midland and/or First American for insuring an extra hazardous risk.

6

CONFIDENTIAL

Defs-Edwards_0037168

Exhibit A
Page 11

9. Indemnity.  Agent agrees to indemnify Midland and/or First American for all loss, cost or damage which Midland and/or First American may sustain or become liable for on account of:

A.  Willful failure of Agent to comply with the terms of this agreement or with the rules, regulations or instructions given to Agent by Midland and/or First American.

B.  Grossly negligent errors or omissions in Agent's abstracting or examining of title.

C.  Intentional omissions from commitments and/or policies of any printed part of the policy or commitment in reference to encumbrances.

D.  Errors or omissions which are disclosed by the application, the approved examiner's report or which were known to Agent and not disclosed to the insured prior to closing and not shown on the policy.

E.  Any negligence on the part of the agent with respect to escrows or closings or any activity on the part of the agent in violation of the first paragraph of section 4 of this agreement.

F.  Any obligation of Agent with respect to the provisions of Section 3J of this Agreement.

G.  Defalcation, fraud or dishonesty on the part of Agent or any employee, officer, agent or director of Agent.

10.  Claims.  If a claim is asserted to Agent, or if Agent is aware of any facts or circumstances which might result in a claim against Midland and/or First American, Agent shall immediately notify Midland and/or First American according to current reporting procedures then in effect and, if required, shall submit a written report, and shall lend all reasonable assistance without charge to Midland and/or First American in investigating or contesting any claim; provided, however, Agent shall not be required to retain counsel or pay attorney's fees in connection with such claim, except as to claims for which Agent is liable under the provisions of Paragraph 9 hereof, and those sums for which Agent is liable under the provisions of paragraph 3(J) hereof.

Midland and/or First American shall proceed with such investigation, negotiation and litigation of any claim of loss as Midland and/or First American shall deem appropriate and shall employ counsel of its choice to render such services as Midland and/or First American shall deem desirable. Midland and/or First American shall keep Agent as fully informed as shall be practicable concerning progress made toward final settlement. Midland and/or First American shall have a sole right to effect a settlement of any claim of loss.

7

CONFIDENTIAL

Defs-Edwards_0037169

Exhibit A
Page 12

11. Termination

A.  This Agreement shall be terminated by any of the following:

(1) Mutual agreement by the parties to terminate.

(2) Written notice of cancellation to take effect 60 days after delivery by either Midland and/or First American or Agent to the other provided that so long as either Midland or First American has an interest in Tower City Title Agency, L.L.C., this section 11.A.(2) shall not be applicable.

(3)  Immediate termination upon the occurrence of any material breach by either Midland and/or First American or Agent of any of their obligations or undertakings to each other and fails to cure such material breach within forty-five (45) days of receipt of written notice to the defaulting party from the non-defaulting party. Material breach on the part of Agent includes, without limitation: (i) claims or losses, paid or reserved, which exceed fifty percent (50%) of the Agent's remitted premiums during any six (6) month period, and (ii) any material deviation from the rules promulgated by Midland and/or First American and furnished to Agent, or entering into an agency, subagency or similar agreement with another title insurance company or underwriter without prior written consent of Midland and/or First American, other than is permitted under Section 1. of this Agreement.

(4) The filing of a petition in bankruptcy by or against either party hereto or the appointment of a receiver for the property of either party where such appointment is based, in whole or in part, on the allegation of insolvency.

(5)  Fraud, cancellation of license or permit to do business, or the instigation of legal proceedings by local, State or Federal authorities, which proceedings, if successful, would lead to cancellation of permit or license to do business, provided, however, that probable cause must exist that any such proceedings will be successful.

(6)  Agent becomes more than thirty (30) days delinquent mailing to Midland and/or First American the monthly report and remittance called for by Paragraph 7 preceding.

8

CONFIDENTIAL

Defs-Edwards_0037170

Exhibit A
Page 13

B.  In the event of a shortage of funds entrusted to Agent by Midland and/or First American or others, Midland and/or First American may cancel and terminate this Agreement immediately upon written notice to the Agent, notwithstanding any provisions contained herein to the contrary, and further, Midland and/or First American may declare immediately due any debts or accounts owed by Agent to Midland and/or First American, and Midland and/or First American shall have a lien on all property of the Agent as security for the repayment to Midland and/or First American of any such debts or accounts and any losses or claims Midland and/or First American may be subjected to by reason of the Agent's inability or refusal to account for funds entrusted to Agent; and on demand by Midland and/or First American, Agent shall forthwith make good the shortage.

C.  On termination of this Agreement it shall be the duty of Agent to furnish to Midland and/or First American at once a complete accounting of all unpaid premiums and promptly to return to Midland and/or First American all files relating to premium-bearing forms issued or about to be issued by Agent on behalf of Midland and/or First American, and all unused forms, blanks and supplies furnished by Midland and/or First American to Agent.  No termination shall affect Agent's right to compensation on applications received by him prior to the termination.

D.  The respective obligations of the parties relating to liability for losses and defending, appearing in, and paying the costs of litigation shall survive any termination of this Agreement, and in the event of any litigation which might result in the assertion of any claim of loss under any policy issued hereunder, or in the event that Midland and/or First American is informed of any circumstances which might result in a claim of loss under any such policy, Midland and/or First American shall have the right to make an examination of the pertinent books, records and papers of the Agent as it may deem advisable or necessary, whether or not this Agreement has been otherwise terminated, and Agent agrees that the books, records and papers will be kept intact.

12.  **Right of First Refusal.**  In the event that Agent shall desire to sell its title insurance agency business, any part thereof or interest therein, and shall receive a bona fide offer from a third party ("Offeror") offering to purchase the business or any part thereof or interest therein, which offer Agent is willing to accept, Agent shall give Midland and/or First American notice of such offer, which notice shall specify the portion of the business or interest therein sought to be purchased (the "Offered Interest") and the price for which and the terms upon which such offer was made, together with the name of the Offeror.  Midland and/or First American shall then have the option, to be exercised by written notice within 30 days after receipt of such notice from Agent (or, if all or any part of the consideration contained in the offer received by Agent shall not be in the form of cash, within 30 days after Agent and Midland and/or First American shall have agreed in writing upon an equivalent cash value) to purchase or find a purchaser for the Offered Interest on the same (or equivalent) terms as contained in Agent's notice.  If Midland and/or First American exercises its said option, the Offered Interest shall be sold by Agent to Midland and/or

9

CONFIDENTIAL

Defs-Edwards_0037171

Exhibit A
Page 14

First American or its designee on the terms aforesaid with the closing of such purchase to occur at the time, place and date fixed in the notice of exercise by Midland and/or First American to Agent (which date shall be not less that 30 nor more than 60 days after the date of Midland's and/or First American's notice). If Midland and/or First American shall elect by written notice to Agent not to exercise its said option or shall fail to exercise said option within the time period set forth above, Agent shall be free for a period of 120 days from the date of such notice from Midland and/or First American or the expiration of the option exercise period, as the case may be, to sell the Offered Interest (but not any rights under this agreement without Midland's and/or First American's prior approval in writing) on terms not more favorable than those contained in its notice aforesaid to the Offer or if Agent shall not sell the Offered Interest on such terms within such 120 day period, then Agent shall be required to give Midland and/or First American a right of first refusal in the manner set forth above with respect to any other proposed sale of the business or any part thereof or interest therein.

The provisions of the preceding paragraph shall apply only to a bona fide arms length sale or assignment, and shall have no application to a merger or consolidation of Agent's corporate entity, a sale or transfer of all or any part of Agent's capital stock, a sale or transfer of the business or any part thereof or interest therein to any corporation which controls, or which is controlled by, or which is under common control with, Agent; provided, however, that the provisions of this Agreement shall bind any purchaser, assignee or transferee referred to in this paragraph.

13. **Assignment.** This Agreement may be assigned by Midland and/or First American to any successor of Midland and/or First American, but shall not be assigned by Agent without Midland's and/or First American's prior written consent. Any assignment by Agent without having obtained Midland's and/or First American's prior written consent is void.

14. **Independent Contractor.** Except for purposes of issuing and delivering title evidence, subject to an in accordance with the terms and provisions of this Agreement, Agent is an independent contractor, and shall be in full and complete control of the operation of his title office, including full control of all personnel.

15. **Notices.** Any notice or other communication hereunder shall be in writing and shall be deemed to be delivered on manual delivery thereof, or upon deposit in the United States mails by Certified Mail, addressed to a party at the address hereinabove set forth, or at such other address as a party shall furnish to the other by notice hereunder.

16. Agent understands and agrees not to solicit customers of Midland and/or First American by representing or implying to such customers that they will receive the same service and underwriting from Agent as if they were dealing directly with Midland and/or First American. Midland and/or First American shall give to Agent the same underwriting considerations however as it would give to its own customers in its direct operations. Agent further agrees, in an effort to avoid confusion in the market, not to represent itself as an agent of Midland or a part of the

10

CONFIDENTIAL

Defs-Edwards_0037172

Midland and/or First American organization, but will instead hold itself out as an agent of First American Title Insurance Company.

Midland and/or First American agrees not to use its competitive advantage knowledge of Agent's customers obtained by or submitted by Agent in requests for underwriting approval on particular transactions.

17.  This Agreement may be executed in counterparts, each of which shall be deemed an original.  Paragraph headings are included for convenience only and are not part of this Agreement.

IN WITNESS WHEREOF, this Agreement is executed as of the *1st* day of *November*, 1998.

MIDLAND TITLE SECURITY, INC.          TOWER CITY TITLE AGENCY, L.L.C.
FIRST AMERICAN TITLE INSURANCE CO.    ("Agent")
("Midland")

By                                    By
James Sipanovich, President, CEO and      Marilyn Mannarino, President
Regional Vice President

                                      By
                                      Marilyn Mannarino
                                      ("Agent" and Individually)

11

CONFIDENTIAL                          Defs-Edwards_0037173

Exhibit A
Page 16

**EXHIBIT  B**

November 6, 2006

# AGENCY AGREEMENT

By this Agency Agreement ("Agreement"), **FIRST AMERICAN TITLE INSURANCE COMPANY**, a California corporation ("First American"), whose locations are at 1111 Superior Avenue, Suite 700, Cleveland, Ohio 44114 and 341 South Third Street, Suite 100, Columbus, Ohio 43215, and **TOWER CITY TITLE AGENCY, LLC**, an Ohio limited liability company, whose address is 6151 Wilson Mills Road, Highland Heights, Ohio 44143 and **MARILYN MANNARINO** (Tower City Title Agency, LLC and Marilyn Mannarino are hereinafter separately and together referred to as "Agent"), agree as follows:

1.    **Appointment.** First American hereby appoints Agent an agent of First American for the transaction of First American's title insurance business which Agent agrees to promote and perform for First American in all counties in Ohio, except that Agent shall not open and/or operate an office in Ottawa County, Ohio. This Agreement will not be effective until Agent has become duly licensed pursuant to the laws of the state of Ohio. The "business of title insurance", as used herein, means rendering any or all of the following services to any legal person in consideration of the payment of a fee:

    A.    Receiving and processing applications for title commitments, title guarantees, judicial reports, guaranteed certificates of title, title insurance policies, endorsements, or other forms of title evidence approved by First American (the "Approved Title Evidences");

    B.    Examining the chain of title to real estate in connection with the issuance of the Approved Title Evidences; and

    C.    Issuing the Approved Title Evidences in accordance with the terms and provisions of this Agreement.

2.    **Authority.** Agent may sign, countersign, and issue commitments, title guaranties and title insurance policies, endorsements and other forms of Approved Title Evidence authorized by First American (herein sometimes referred to as "Approved Title Evidence" or "Premium-Bearing Forms"), only on real estate located in the county or counties of the state(s) referred to above, and in such other counties as may be designated by First American.

3.    **Agent's Obligations.** Agent shall:

    A.    Maintain and operate a business office as a title insurance agent, maintain adequate personnel to originate and service such business, and remain actively engaged in such business.

    B.    Take all reasonable steps to solicit title insurance business and to promote the use of title insurance in the area in which Agent does business.

---

**CONFIDENTIAL**

Defs-Edwards_0004079

C.     Receive and process applications for title insurance in accordance with the usual and customary practices and procedures of responsible title insurance agencies in the conduct of their business in a prudent, safe, sound, and ethical manner in accordance with recognized title underwriting principles and the rules, regulations and instructions of First American.  The determination of the insurability of any title, subject to the provisions of Section 5, shall be based upon one or more of the following:

(1)     A search by, or at the instance of, Agent of all relevant public records.

(2)     An examination of the abstract of title prepared and certified by Agent or by another recognized abstracter whose work is accepted by prudent local title examiners and whose work shows all relevant public records.

(3)     An examination of Agent's indices and records supplemented to the extent necessary by an abstract or search of the relevant public records.

(4)     Title reports or opinions, on forms furnished or approved by First American.

D.     Preserve in its possession all supporting documents on which the determination of insurability is made, including, but not limited to, affidavits, lien waivers, searches, and work sheets; and provide First American with access to said documents at any reasonable time or times.

E.     Assume full responsibility for the collection of all premiums due in accordance with the rates established in Section 7 of this Agreement for properties located in the state of Ohio and pay to First American the share of such premium due First American on or before the 15th day of the month succeeding that in which the Premium-Bearing Form was issued.  Each payment to First American shall be accompanied by a copy of each Premium-Bearing Form issued during the period covered by the remittance.

F.     Keep a policy register in a form approved by First American in which Agent shall enter a record of and show the disposition of all policies, endorsements and other contracts under which First American assumes liability for the condition of title.  Agent shall be liable in damages for any loss resulting to First American by reason of the loss or wrongful use of any Premium-Bearing Forms.

G.     Keep safely and segregated in a bank account all monies that may be entrusted to Agent in the course of Agent's operations hereunder, and keep safely any property so entrusted to Agent and disburse such funds only for the

2

Defs-Edwards_0004080

purpose for which they were deposited.  At the request of First American, any funds or property deposited with Agent as security for the disposition of or affirmative insurance with respect to a matter that would be included in Schedule "B" of the policy, shall be transferred to First American, together with a copy of the agreement or other documentation pursuant to which the funds or property were received, and such funds or property are to be retained by and under the control of First American in the same manner as similar funds or property held by First American pending disposition pursuant to  the agreement under which it was received.

H.     Make available at all reasonable times for examination and review by First American all accounts, books, ledgers, searches, abstracts and other records of Agent relating to the title insurance business carried on by Agent for First American.

I.     Maintain all of its accounts and financial transactions in accordance with procedures acceptable by state law, and generally accepted accounting principles.

J.     Upon request, timely provide to First American a balance sheet and profit and loss statement prepared by a certified public accountant.

K.     Carry at its own expense title insurance agent's errors and omissions liability ("E & O") insurance in a principal sum not less than $500,000.00 issued by a company or companies acceptable to First American and furnish First American with current premium receipts.  Agent agrees to timely notify its E & O carrier of any claims resulting from Agent's negligence or misconduct, whether or not requested to do so by First American.  If Agent, however, in its sole election and discretion, waives the requirement that Agent so notify its E & O carrier in the event of a claim, then in such event, Agent shall be liable to pay all amounts, including attorney fees, up to and including the first Twenty-Five Hundred Dollars ($2,500.00) of each loss arising on any one Approved Title Evidence or Premium-Bearing Form issued by Agent, provided any loss is attributable to the negligence or misconduct of Agent or its employees or independent contractors.  Liability of Agent for such sum or sums as it may become liable to pay hereunder shall not end upon the termination of this Agreement but shall continue for as long as any Approved Title Evidence or Premium-Bearing Form issued by Agent remains in force.

L.     Comply with licensing requirements, if any, and all other applicable state and federal laws and governmental regulations relating to the conduct of the business of Agent as established, from time to time, by appropriate governmental authorities including, without limitation, the Ohio Department of Insurance.   Specifically included in the foregoing, but without limitation, is Agent's obligation to comply with any state or federal requirements with respect to Privacy Policy Notices and Disclosures, state or local income tax requirements,

3

Defs-Edwards_0004081

state escheatment laws and state and federal anti-inducement laws and regulations, including the Real Estate Settlement Procedures Act (a.k.a. RESPA).

       **4.**    <u>No Agency For Escrow or Closing</u>.  It is understood and agreed that Agent is not an agent of First American for the transaction of escrow or closing business and First American expressly denies liability for Agent's conduct of such business.  Agent recognizes, however, that claims for liability resulting from Agent's conduct of such business might nevertheless be asserted against First American and, in an effort to minimize such risk, Agent agrees to adhere in its conduct of any such business to the laws of the state of Ohio and all regulations and bulletins promulgated by the Ohio Department of Insurance governing, pertaining to or otherwise affecting the operation of such business.  Agent also agrees to adhere to generally accepted practices for the sound operation of an escrow and closing business.  Agent agrees to keep safely and segregated in separate bank accounts all monies entrusted to it in the course of its escrow or closing business and to make available at all reasonable times for examination and review by First American all accounts, books, ledgers, files and other records of Agent relating to its escrow or closing business.

       Although any escrow business conducted by Agent is not within the scope or authority of this Agreement, First American may from time to time, as an accommodation to Agent in the promotion of Agent's title insurance agency business, issue a "closing protection letter" to a prospective insured being processed by Agent, the effect of which is to bind First American to indemnify the addressee thereof against certain losses resulting from Agent's errors, omissions or misconduct in acting as escrow agent for the parties to the transaction, all in accordance with the terms and conditions stated in such letter.  In the event First American makes payment of a claim arising out of the conduct of Agent's escrow business (whether or not based on such letter of indemnity) either as a result of entry of judgment against First American or as a result of compromise and settlement, Agent shall promptly reimburse First American for the full amount of First American's expenditures, including attorney fees and costs of litigation or settlement negotiations.

       Agent agrees that at any reasonable time or times during the term of this Agreement, it will permit examination by First American of all accounts, books, ledgers, tax returns and other financial and business records relating to the title insurance business conducted by Agent for First American.  The parties hereto agree that the manner of operation of any escrow business by Agent is a legitimate concern of First American because of issuance by First American of "closing protection letters" and because the quality of such services performed by Agent bears on Agent's continuing ability to generate title insurance business on behalf of First American.  Agent, therefore, agrees that although Agent's escrow business is outside the scope of the agency relationship created by this Agreement, First American shall be permitted at any reasonable time or times to examine all financial and business records relating to any escrow business conducted by Agent.

<div align="center">4</div>

Defs-Edwards_0004082

Exhibit B
Page 20

5.    **Prohibitions.** Agent shall not, without written approval of First American:

A.    Incur debts in the name of First American; admit, deny or adjust any claim for loss; or accept service of process on behalf of First American.

B.    Commit First American to:  (1) a risk in excess of $1,000,000.00; (2) a risk involving a title where Agent has knowledge that a dispute exists among lawyers;  (3) a risk where Agent has knowledge of risks or adverse claims;   (4) any extraordinary risk as set forth in First American's rules, instructions or manuals. All such titles, together with the supporting abstracts, certificates of title, chain of title (if no abstract is furnished) searches, and a statement of the special question involved, if any, shall be submitted to First American for consideration before Agent incurs any liability on behalf of First American.

C.    Commit First American to any interpretation of the printed terms of any document.

D.    Accept or agree to accept any holdbacks, hold harmless agreements or indemnity agreements, whether secured or unsecured, as a basis for affirmatively insuring over, or omitting from a policy, any title risk or exception.

E.    Alter forms furnished by First American.

F.    Insert or include any statement or information in any form furnished by First American which is known by Agent to be untrue, inaccurate or intentionally misleading.

G.    Knowingly fail to include any defect, lien, encumbrance or other matter affecting title on any commitment or title insurance policy where an exception for any such defect, lien or encumbrance is necessary or appropriate.

H.    Accept an application for title insurance for an amount less than the approximate value of the premises involved in the case of an owner's policy, or for less than the amount of the indebtedness in the case of a lender's policy, or otherwise vary from the applicable rates established by First American from time to time.

I.    Accept service of legal process on behalf of First American unless required by state law, in which event Agent shall immediately forward to First American all documents served.

J.    Request First American to issue its title policy or other indicia of title insurance provided for herein knowing it, Agent, at that time is in default or otherwise negligent in the performance of any of its obligations and agreements contained herein.

5

Defs-Edwards_0004083

Exhibit B
Page 21

6.   **First American's Obligations.**  First American shall:

A.   Furnish Agent with all commitments, policies, endorsements and other contracts under which First American assumes liability for the condition of title.

B.   Determine all questions of risk submitted by Agent.

C.   Provide for reinsurance when necessary.

D.   Appoint Agent in writing as a validating officer to countersign the forms issued to Agent.

7.   **Compensation and Remittance.**  Agent agrees to be responsible for the collection of all premiums for Approved Title Evidence issued by Agent in accordance with the then effective schedule of rates as filed with the Ohio Department of Insurance by First American and shall retain _____ as its commission on all premiums written.  The balance of said premium _____ shall be remitted to First American no later than the 15th of the month following the month in which such premiums are written.  Agent acknowledges that all premiums, except for Agent's commission, are the exclusive property of First American from the time received by Agent and shall not be deemed as trade payables or general accounts payables of Agent.  All remittances not received by First American within sixty (60) days from the date on which such remittances are due shall automatically accrue interest at a rate equal to two percent (2%) per annum above the Prime Rate of National City Bank, Cleveland, Ohio, in effect from time-to-time, until paid.  Agent shall forward to First American with each monthly report and remittance a copy of each form of Approved Title Evidence referred to therein.  First American retains the right to revise the remittance date and/or schedule rates, whereupon the remittance schedule shall be altered accordingly; provided, however, that no increase in rates shall apply to applications for title insurance or other contracts pending in Agent's office at the effective date of such revision nor shall any revision alter Agent's right to compensation already earned.

If the current annual tax, gross premium tax or State Income Tax rate, as applicable, shall be increased, or should a tax or assessment in addition, substitution or in lieu thereof be imposed on First American, either by constitutional amendment, legislative act or otherwise and should said tax or assessment be higher than the tax as presently paid by First American, Agent and First American shall, in good faith, renegotiate the percentage of gross premiums paid to First American hereunder.

In the event that the parties cannot, after good faith negotiations, come to any agreement, then First American shall have the option to terminate this Agreement by giving 60 days written notice to Agent in accordance with Section 11 (A) (2) following.

6

8. **Reinsurance and Coinsurance; Extra Hazardous Risks.** First American shall have sole discretion as to whether any particular risk shall be reinsured or coinsured by another title insurance company. If any risk is reinsured or coinsured, Agent's compensation shall be computed on the basis of the net amount remaining after taking into account the cost of such reinsurance or coinsurance. Agent will not be entitled to any portion of any premium paid for reinsurance or coinsurance, or any additional premium charged by First American for insuring an extra hazardous risk.

9. **Indemnity.** Agent agrees to indemnify First American for all loss, cost or damage which First American may sustain or become liable for on account of:

A. Willful failure of Agent to comply with the terms of this Agreement or with the rules, regulations or instructions given to Agent by First American.

B. Grossly negligent errors or omissions in Agent's abstracting or examining of title.

C. Intentional omissions from commitments and/or policies of any printed part of the policy or commitment in reference to encumbrances.

D. Any failure by Agent to include in any commitment or policy appropriate requirements or exceptions as to any defect, lien, encumbrance or objection which was known to Agent or which, in the course of a careful and prudent title examination, should have been known to Agent.

E. Errors or omissions which are disclosed by the application, the approved examiner's report or which were known to Agent and not disclosed to the insured prior to closing and not shown on the policy.

F. Any negligence on the part of Agent with respect to escrows or closings or any activity on the part of Agent in violation of the first paragraph of Section 4 of this Agreement.

G. Any obligation of Agent with respect to the provisions of Section 3(K) of this Agreement.

H. Defalcation, fraud or dishonesty on the part of Agent or any employee, officer, agent or director of Agent.

10.    Claims.  If a claim is asserted to Agent, or if Agent is aware of any facts or circumstances which might result in a claim against First American, Agent shall immediately notify First American according to current reporting procedures then in effect and, if required, shall submit a written report, and shall lend all reasonable assistance without charge to First American in investigating or contesting any claim; provided, however, Agent shall not be required to retain counsel or pay attorney's fees in connection with such claim, except as to claims for which Agent is liable under the provisions of Section 9 hereof, and those sums for which Agent is liable under the provisions of Section 3(K) hereof.

First American shall proceed with such investigation, negotiation and litigation of any claim of loss as First American shall deem appropriate and shall employ counsel of its choice to render such services as First American shall deem desirable. First American shall keep Agent as fully informed as shall be practicable concerning progress made toward final settlement. First American shall have a sole right to effect a settlement of any claim of loss.

11.    **Termination**

A.    This Agreement shall be terminated by any of the following:

(1)    Mutual agreement by the parties to terminate.

(2)    Immediate termination by First American upon notice in writing to Agent upon the occurrence of any of the following:

(a)    Material breach by Agent of any of the Terms or Provisions of this Agreement or any material deviations from the rules promulgated by First American and furnished to Agent.

(b)    The filing of a petition in bankruptcy of Agent or the appointment of a receiver for the property of Agent where such appointment is based, in whole or in part, on the allegation of insolvency.

(c)    Cancellation of license or permit to do business, or the instigation of legal proceedings by local, state or federal authorities, which proceedings, if successful, would lead to cancellation of permit or license to do business.

(d)    Agent becomes more than thirty (30) days delinquent mailing to First American the monthly report and remittance called for by Section 7 preceding.

(e)    Agent commits or is involved with any act of fraud, dishonesty, misconduct or unethical behavior.

(f)    There occurs any substantial change in the ownership, management or control of Agent's title insurance business.

8

CONFIDENTIAL

Defs-Edwards_0004086

Exhibit B
Page 24

(g)     Failure by Agent to be in compliance with each of the following requirements:

(a)     compliance in all material respects with the Real Estate Settlement Procedures Act of 1974, as amended, and any rules and regulations promulgated thereunder, and all other federal, state and local laws, rules and regulations;

(b)     maintenance of a valid operating license or permit with each state or other jurisdiction in which the Agent operates and which requires a license or permit;

(c)     delivery of financial statements to First American not less frequently than annually and otherwise in accordance with Section 3, such financial statements to be prepared in accordance with Generally Accepted Accounting Principles ("GAAP") consistently applied;

(d)     preparation of an accurate, monthly trial balance for each escrow file opened during such month;

(e)     reconciliation of all trust fund bank accounts with the related escrow file trial balances within 30 days of the end of each calendar month and resolution of any deposits in transit, any adjustments (whether positive or negative) and any overdrafted escrow files within each such 30-day period;

(f)     maintenance of escrow or trust fund bank accounts, which accounts are at all times fully funded and at no time overdrafted;

(g)     absence of any significant deficiencies arising out of any examination by First American's internal audit staff, which deficiencies are not resolved by First American's reasonable satisfaction within a reasonable period following the issuance of the relevant audit report.

B.     In the event of a shortage of funds entrusted to Agent by First American or others, and/or in the event that Agent is or has committed any act of fraud, dishonesty or misconduct, First American may cancel and terminate this Agreement immediately upon written notice to Agent, notwithstanding any provisions contained herein to the contrary, and further, First American may declare immediately due any debts or accounts owed by Agent to First American.

C.     On termination of this Agreement it shall be the duty of Agent to furnish to First American at once a complete accounting of all unpaid premiums and  promptly to return to First American all files relating to Premium-Bearing

9

Defs-Edwards_0004087

Exhibit B
Page 25

Forms issued or about to be issued by Agent on behalf of First American, and all unused forms, blanks and supplies furnished by First American to Agent. No termination shall affect Agent's right to compensation on applications received by Agent prior to the termination.

        D.    The respective obligations of the parties relating to liability for losses and defending, appearing in, and paying the costs of litigation shall survive any termination of this Agreement, and in the event of any litigation which might result in the assertion of any claim of loss under any policy issued hereunder, or in the event that First American is informed of any circumstances which might result in a claim of loss under any such policy, First American shall have the right to make an examination of the pertinent books, records and papers of Agent as it may deem advisable or necessary, whether or not this Agreement has been otherwise terminated, and Agent agrees that the books, records and papers will be kept intact.

    12.    **Notice of Intent to Sell Any Interest.** In the event that Agent or any principal of Agent (i.e. shareholder, member, partner, etc.) shall desire to sell its title insurance agency business, any part thereof or interest therein, and shall receive a bona fide offer from a third party (the "Offeror") offering to purchase the business or any part thereof or interest therein, which offer Agent or any principal of Agent is willing to accept, Agent or principal of Agent shall give First American written notice of such offer. Said written notice shall specify the portion of the business or interest therein sought to be purchased (the "Offered Interest") and the name, address and social security number/tax identification number of the Offeror. First American shall have the right to investigate the background, including, but not limited to, criminal and credit, of the Offeror.

    The Offeror must provide First American an application and a written release to conduct the background investigation. If the Offeror refuses to provide such written release or if, after such release is received and investigation conducted, the Offeror does not meet the standards and qualifications of First American, First American shall have the right, if the sale is consummated, to immediately terminate this Agreement.

    13.    **Credit Reports.** First American shall have the complete and absolute right and authority to perform any and all credit reports or other consumer reports and/or examinations at any time First American deems such reports and/or examinations necessary. Agent shall cooperate with First American in any way necessary to obtain any and all credit reports or other consumer reports and/or examinations. In the event First American deems such reports and/or examinations necessary, all costs and fees shall be borne by First American.

    14.    **Assignment.** This Agreement may be assigned by First American to any successor of First American, but shall not be assigned by Agent without First American's prior written consent. Any assignment by Agent without having obtained First American's prior written consent is void.

<div align="center">10</div>

**CONFIDENTIAL**

15.     **Independent Contractor,** Except for purposes of issuing and delivering title evidence, subject to and in accordance with the terms and provisions of this Agreement, Agent is an independent contractor, and shall be in full and complete control of the operation of Agent's title office, including full control of all personnel.

16.     **Notices.** Any notice or other communication hereunder shall be in writing and shall be deemed to be delivered on manual delivery thereof, or upon deposit in the United States mails by Certified Mail, addressed to a party at the address hereinabove set forth, or at such other address as a party shall furnish to the other by notice hereunder.

17.     **Failure to Enforce – Not Waiver.** The failure of First American to enforce the performance by Agent of any provision of this Agreement or exercise any right or remedy based upon Agent's breach of any provision in this Agreement or the acceptance by First American of any payment, remittance of payment or other action or inaction during Agent's failure to perform or Agent's breach shall not be a waiver by First American of its rights under this Agreement and shall not be construed to be an Amendment or Modification of this Agreement

18.     **Counterparts and Headings.** This Agreement may be executed in counterparts, each of which shall be deemed an original. Section headings are included for convenience only and are not part of this Agreement.

IN WITNESS WHEREOF, this Agreement is executed as of the 9 day of _Nov_, 2006.

FIRST AMERICAN TITLE INSURANCE COMPANY, a California corporation

By: _____

Todd A. Jones, Vice President


TOWER CITY TITLE AGENCY, LLC, an Ohio limited liability company

By: _____

Marilyn Mannarino, President

_____

Marilyn Mannarino, "Agent"

11

CONFIDENTIAL                                          Defs-Edwards_0004089

Exhibit B
Page 27

**EXHIBIT  C**

Tower City Title Agency, LLC                                    http://replay.waybackmachine.org/20060423031123/http://www.towercity...



4/7/2011 8:38 AM

Exhibit C
Page 28

Tower City Title Agency, LLC                    http://replay.waybackmachine.org/20060423031123/http://www.towercity...

| Affiliate | Web Address |
|-----------|-------------|
| First American Title Insurance Company | www.firstam.com |
| Old Republic National Title Insurance Co. | www.oldrepublictitle.com |
| Ohio Association of Mortgage Brokers | www.oamb.org |
| National Association of Mortgage Brokers | www.namb.org |
| Better Business Bureau | www.bbb.org |
| American Land Title Association | www.alta.org |
| Ohio Land Title Association | www.olta.org |
| Cleveland Land Title Association | |
| Summit Land Title Organization | |
| Cleveland Area Board of Realtors | www.cabor.com |
| Council of Smaller Enterprises | www.cose.com |
| Female Business Enterprise | |
| Fannie Mae | www.fanniemae.com |
| Freddie Mac | www.freddiemac.com |
| Mortgage Calc | www.mortgage-calc.com |
| 123 Movers.com | www.123movers.tv |
| Home Mortgage Rates | www.homemortgagerates.net |
| Top Real Estate In Usa | www.toprealestateinusa.com |
| A Hot Mortgage | www.ahotmortgage.com |
| Finance and Rates | www.financeandrates.com |
| Itsalist Directory | www.itzalist.com |
| Reals | www.reals.com |
| Jackie's Baskets | www.jackiesbaskets.com |
| Real Estate Guide USA | www.reguideusa.com |
| FHA Home Loans | www.fha-home-loans.com |
| Homedecorating.com | www.home-decorating.com |
| Startremodeling.com | www.startremodeling.com |
| Top Moving Company 4 You | www.topmovingcompany4u.com |
| Rennovation Supply | www.rensup.com |
| Top Real Estate in USA | www.uprealestate.com |
| Home Construction Advisors group | www.hcag.org |
| New Homes Reviews | www.newhomesreviews.com |
| Start Remodeling | www.startremodeling.com |
| Vinyl Siding and Windows | www.vinyl-siding-n-windows.com |
| Mortgage Directory | www.mortgagedirectory.com |
| Mortgage Magazine | www.mortgagemag.com |
| Boxes Delivered.com | www.boxesdelivered.com |
| Quote for Insurance Directory | www.quoteforinsurancedirectory.com |
| News, and information for real estate appraisers | www.appraisaltoday.com |
| Home loan information and advice | www.home-loans-help.com |
| Wholesale prices on all of your moving supplies | www.directmovingboxes.com |
| Sell your home by owner here | www.propertysites.com |
| Up to 125% of the value of your home | www.125-home-equity-loans.com |
| Mortgage loan products and rates | www.apdloans.com |
| Home improvement directory | www.fbhome.com |
| real estate web portal directory | www.realestatehomesale.com |
| providing the world with resources | www.resourcehelp.com |
| Mortgage resource directory | www.usemortgage.com |
| Your #1 income property resource | www.buyincomeproperties.com |
| Cincinnati Real Estate | www.cincihomesforsale.com |

4/7/2011 8:38 AM

**Exhibit C**
**Page 29**

Tower City Title Agency, LLC                        http://replay.waybackmachine.org/20060423031123/http://www.towercity...

realtor in Toledo, Ohio                    www.judykasper.com

providing the world with resources         www.resourcehelp.com

# TRUST   CONFIDENCE   TRADITION

Exhibit C
Page 30

**EXHIBIT  D**

Tower City Title Agency, LLC                                   http://replay.waybackmachine.org/20060427094032/http://towercity.com...

## Tower City Title Agency, LLC

Residential & Commercial Closing

Order Title Work | Service | About Us | Affiliations | Testimonial | Terms & Definitions | Insurance Rates | For Sale By Owner Info.

Home | Locations | Contact Us



**The Tower You Can Lean On**

### About Us

Why should you choose Tower City Title Agency? I can sum it up with three words: strength, knowledge and service.

Tower City Title Agency is strong because of our affiliation with First American Title Insurance Co., one of the nation's top three underwriters. You also have peace of mind knowing that your title work is protected by insurance against errors and omissions for up to $1 million.

Knowledge comes from training and experience. I have worked in the title industry for over 30 years and many of our top managers have similar years of service.   Our employees are the best trained and most dedicated group in the title industry, with the know-how that comes from handling a high volume of real estate transactions on a daily basis, from the simple to the very complex.

Most importantly, we offer you the best service. At Tower City Title, we never say "No." Going the extra mile for you is business as usual. That means coming to wherever you are and whenever it's convenient for you to complete a closing. We bring checks to the real estate agent or broker. We get payoffs and prepare complete sets of bank papers. You'll save time with Tower City Title, and we all know that time saved is money saved.

We are also committed to helping you become better educated about the process, whether you're a broker, a lender or a property owner. I am in the office on a daily basis, so I invite you to "Ask The President" any questions you might have, and I promise to get back to you with a fast answer.

I am also proud to say that Tower City Title has been a family owned and operated company since 1984, and the Mannarino "family" extends to all our employees, including those who have met their spouses here and continue to work together in a fun atmosphere where our number-one goal is to please you. We embrace the world-famous "Fish Philosophy" that encourages employees to have a good time at work, choose to have a positive attitude and be there for each other and for the customers to "make their day."

That's why you should choose Tower City Title Agency for residential or commercial title services, land contract conversions, purchase transactions and much more. Let us show you how we can be "The Tower You Can Lean On."

Signed,

*Marilyn Mannarino*
President
Tower City Title Agency

### Ask The President



**Marilyn Mannarino
Founder and President**

Marilyn brings her 30-plus years of title experience to Tower City Title. She still oversees the day-to-day operation of the company she helped establish. You will find her readily available at extension 111 to help assist our clients and employees. She is an active participant in many of the industry's association groups, such as ALTA, OLTA, The National and Ohio Associations of Mortgage Brokers, CABOR and GECAR. She is the mother of five children and the proud grandmother of seven grandchildren.

1 of 1                                                                                      4/7/2011 8:36 AM

**Exhibit D
Page 31**