1   Robert F. Scoular (SBN 085293)
    robert.scoular@snrdenton.com
2   Ronald D. Kent (SBN 100717)
    ronald.kent@snrdenton.com
3   Michael J. Duvall (SBN 276994)
    michael.duvall@snrdenton.com
4   SNR DENTON US LLP
    601 South Figueroa Street, Suite 2500
5   Los Angeles, California 90017-5704
    Telephone:  (213) 623-9300
6   Facsimile:  (213) 623-9924

7   Charles A. Newman (*Pro Hac Vice*)
    charles.newman@snrdenton.com
8   SNR DENTON US LLP
    211 North Broadway, Suite 3000
9   St. Louis, Missouri 63102
    Telephone:  (314) 241-1800
10  Facsimile:  (314) 259-5959

11  Margo Weinstein (*Pro Hac Vice*)
    MWeinstein@millershakman.com
12  MILLER SHAKMAN & BEEM LLP
    180 N. LaSalle Street, Suite 3600
13  Chicago, Illinois 60601
    Telephone:  (312) 263-3700
14  Facsimile:  (312) 263-3270

15  Attorneys for Defendants
    FIRST AMERICAN FINANCIAL CORPORATION and
16  FIRST AMERICAN TITLE INSURANCE COMPANY

17

18          IN THE UNITED STATES DISTRICT COURT

19          CENTRAL DISTRICT OF CALIFORNIA

20  DENISE P. EDWARDS,                    No. CV07-03796 SJO (FFMx)
    individually and on behalf of all
21  others similarly situated,            DEFENDANTS' MEMORANDUM OF
                                          POINTS AND AUTHORITIES IN
22              Plaintiffs,               SUPPORT OF MOTION FOR
                                          SUMMARY JUDGMENT
23      vs.
                                          [Filed concurrently with Notice of
24  FIRST AMERICAN FINANCIAL              Motion and Motion for Summary
    CORPORATION and                       Judgment, Statement of Uncontroverted
25  FIRST AMERICAN TITLE                  Facts and Conclusions of Law,
    INSURANCE COMPANY,                    Declarations of Todd A. Jones, Craig
26                                        W. Syby, and Michael J. Duvall, and
                Defendants.               [Proposed] Judgment]
27
                                          Hearing Date:    March 11, 2013
28                                        Time:            10:00 a.m.

SNR DENTON US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1

# **TABLE OF CONTENTS**

2  INTRODUCTION ................................................................................. 1

3  FACTS ................................................................................................. 2

4  I.  Plaintiff And The Class's RESPA Claim ................................... 2

5       A.  The Alleged Kickback And "Referral" Agreement ........... 2

6       B.  FATIC's And Tower City's Agency Relationship ............. 2

7       C.  Tower City's Issuance Of Title Insurance On Behalf Of
            FATIC ................................................................................. 4
8
9  II.  Defendants' Motion to Dismiss .................................................. 5

   ARGUMENT ...................................................................................... 5
10
   I.  Standard For Granting Summary Judgment .............................. 5
11
12  II.  Defendants Are Entitled To Summary Judgment Under RESPA
        Section 8(a) Because There Was No "Referral" By Tower City To
        FATIC .......................................................................................... 6
13
14       A.  Under RESPA, The Issuance Of Title Insurance Is A Unitary
             Act By The Underwriter And Its Agent, Incapable Of Being
             "Referred." ........................................................................ 6
15
16            1.  RESPA Section 8(a) And Regulation X .................... 6

17            2.  Plaintiff And The Class's RESPA Claim Is
                  Unsupported By The Statute ..................................... 7
18
         B.  Tower City, As FATIC's Policy-Issuing Agent, Could Not
             "Refer" Anything To Its Principal. ................................... 13
19
20  III.  Alternatively, Defendants Are Entitled To Partial Summary
          Judgment On The Issue Of Damages Because The Portion Of The
          Policy Premiums Owed To FATIC Was Only 15% Of That
21        Charged By Tower City. ............................................................ 16

22  CONCLUSION ................................................................................. 18

23

24

25

26

27

28

SNR DENTON US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SNR DENTON US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Arthur v. Ticor Title Ins. Co. of Fla.*,
    569 F.3d 154 (4th Cir. 2009) .................................................................9

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ...........................................................................6

*Copperweld Corp. v. Indep. Tube Corp.*,
    467 U.S. 752 (1984) .........................................................................15

*DeHorney v. Bank of Am. Nat'l Trust & Sav. Ass'n*,
    879 F.2d 459 (9th Cir. 1989) .............................................................15

*Freeman v. Quicken Loans, Inc.*,
    132 S. Ct. 2034 (2012).......................................................................9

*Fregoso v. Wells Fargo Dealer Servs.*,
    2012 U.S. Dist. LEXIS 151785 (C.D. Cal. Oct. 16, 2012) ................6

*Hazewood v. Found. Fin. Grp.*,
    551 F.3d 1223 (11th Cir. 2008) ..........................................................9

*Jack Russell Terrier Network v. Am. Kennel Club, Inc.*,
    407 F.3d 1027 (9th Cir. 2005) ...........................................................15

*Khatib v. Cnty. of Orange*,
    639 F.3d 898 (9th Cir. 2011) ..............................................................8

*Kruse v. Wells Fargo Home Mortg.*,
    383 F.3d 49 (2d Cir. 2004) .................................................................9

*Lang v. First Am. Title Ins. Co. of N.Y.*,
    816 F. Supp. 2d 214 (W.D.N.Y. 2011).............................................9

*New York v Hendrickson Bros., Inc.*,
    840 F.2d 1065 (2d Cir. 1988) ...........................................................17

*Philip Morris USA v. Williams*,
    549 U.S. 346 (2007) .........................................................................17

*Putnam Family P'ship v. City of Yucaipa,*
   673 F.3d 920 (9th Cir. 2012) ...................................................................10

*Schuetz v. Banc One Mortg. Corp.,*
   292 F.3d 1004 (9th Cir. 2002) .................................................................11

*Schwarzschild v. Tse,*
   69 F. 3d 293 (9th Cir. 1995) .....................................................................2

*St. Louis, Iron Mountain & S. Ry. v. Williams,*
   251 U.S. 63 (1919) ...................................................................................17

*State Farm Mut. Auto. Ins. Co. v. Campbell,*
   538 U.S. 408 (2003) .................................................................................17

*Travelers Cas. & Sur. Co. Am. v. Desert Gold Ventures, LLC,*
   2010 WL 546376 (C.D. Cal. Feb. 10, 2010) ...........................................15

*United States v. Graf,*
   610 F.3d 1148 (9th Cir. 2010) .................................................................14

*United States v. Parise,*
   159 F.3d 790 (3d Cir. 1998) ....................................................................15

*Wells Fargo & Co. v. Wells Fargo Express Co.,*
   556 F.2d 406 (9th Cir. 1977) ...................................................................14

## State Cases

*Dist. Cablevision Ltd. v. Bassin,*
   828 A.2d 714 (D.C. 2003) ........................................................................17

*Orebaugh v. Wal-Mart Stores, Inc.,*
   2007 WL 2758599 (Ohio App. 12 Dist. 2007)...................................14, 15

## Federal Statutes

12 U.S.C. § 2602(3) .................................................................................7, 9, 16

12 U.S.C. § 2602(4) ........................................................................................8

12 U.S.C. § 2607(a) ..............................1, 2, 5, 6, 8, 10, 11, 12, 13, 15

12 U.S.C. § 2607(d) ......................................................................................16

12 U.S.C. § 2607(d)(2) ..............................................................................2, 18

SNR DENTON US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

SNR DENTON US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

12 U.S.C. § 2617(a) .............................................................................................. 7

Pub. L. No. 93-533, 88 Stat. 1724 (Dec. 22, 1974) ......................................... 11

Pub. L. No. 98-181, 97 Stat. 1231 (Nov. 30, 1983) ........................................ 11

Pub. L. No. 111-203 (July 21, 2010) .................................................................. 7

**State Statutes**

Ohio Rev. Code § 3953.01(A)-(C) ................................................................... 14

Ohio Rev. Code § 3953.01(H) ........................................................................... 13

**Federal Rules**

Fed. R. Civ. P. 23(f) ............................................................................................. 6

Fed. R. Civ. P. 56(a) ............................................................................................. 6

**Federal Regulations**

12 C.F.R. § 1024 ................................................................................................... 7

24 C.F.R. § 3500.2 ........................................................................................ 7, 10

24 C.F.R. § 3500.2(b) ................................................................................... 7, 8, 9

24 C.F.R. § 3500.14(b) ......................................................................................... 6

24 C.F.R. § 3500.14(f) ......................................................................................... 7

24 C.F.R. § 3500.14(f)(1) ..................................................................................... 8

24 C.F.R. § 3500.14(f)(2) ................................................................................... 10

24 C.F.R. § 3500 App. B Nos. 3-4 ................................................................... 10

**Other Authorities**

Barron *et al.*, Fed. Regulation of Real Estate Mortg. Lending § 2:48 (2010) ......... 12

Black's Law Dictionary 1394 (9th ed. 2009) ..................................................... 8

H.R. Rep. No. 97-532 (1982) ............................................................................ 11

HUD Statement of Policy 1996-4, Fed. Reg. 49,397, 49,399 (Sept. 19, 1996) ...... 10

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Joyce Palomar, Title Insurance Law (2012) § 1:15 ..................................................... 9

Joyce Palomar, Title Insurance Law (2012) § 1:8 ...................................................... 4

Joyce Palomar, Title Insurance Law (2012) § 4:5 ...................................................... 4

Joyce Palomar, Title Insurance Law (2012) § 4:8 ...................................................... 4

Joyce Palomar, Title Insurance Law (2012) § 21:2 ................................................... 12

Joyce Palomar, Title Insurance Law (2012) § 21:7 ............................... 11, 12, 13, 15

Pannabecker & Stemler, The RESPA Manual: A Complete Guide to the Real
    Estate Settlement Procedures Act § 3.03 (2010) ................................................. 12

Restatement (Third) of Agency § 6.01 .................................................................... 14

SNR DENTON US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1

**INTRODUCTION**

2       Plaintiff and the class's single claim -- that RESPA Section 8(a) (12 U.S.C.

3  § 2607(a)) was violated by Defendants' purchase of an interest in Tower City Title

4  Agency, LLC ("Tower City") -- is not only unprecedented, it is unsupportable.  The

5  undisputed facts, the legislative history of RESPA, the terms of the statute, the

6  implementing regulations, and the analysis of leading RESPA commentators all

7  support the Defendants' Motion for Summary Judgment.

8       Defendants' Motion presents a very straightforward legal issue:  whether an

9  authorized title insurance agent (*i.e.*, Tower City) of an underwriter (*i.e.*, First

10  American Title Insurance Company ("FATIC")), when issuing that underwriter's title

11  policy, "refers" something to the underwriter.

12       The undisputable facts of this case are that Tower City had the authority from

13  FATIC to issue Plaintiff's and the class members' title policies.  A careful review of

14  the legislative history and a parsing of RESPA and its regulations support the legal

15  conclusions that:  (1) title insurance is a singular "settlement service" -- a continuum

16  incapable of being "referred" in portions; and (2) when a title insurance policy is

17  issued by an authorized agent, the agent and the underwriter are a singular "provider"

18  of a "title service."  That is, a policy-issuing agent does not "refer" anything to its

19  principal underwriter when acting *on the principal's behalf.*   Therefore, Defendants'

20  Motion for Summary Judgment should be granted as to the question of liability under

21  RESPA Section 8(a).

22       Alternatively, if the Court denies summary judgment on liability, Defendants

23  are entitled to partial summary judgment on the issue of damages.  This is because

24  under RESPA Section 8(d)(2) (12 U.S.C. § 2607(d)(2)), the measure damages is

25  determined by the settlement service "involved in the violation."  Plaintiff and the

26  class claim that the settlement service at issue here is solely FATIC's underwriting of

27  title policies.  The undisputable facts are that when underwriting policies issued by

28  Tower City, FATIC was to receive only 15% of the premiums paid, while Tower City

SNR DENTON US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

-1-

SNR DENTON US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1  kept 85% for its policy issuance.   Thus, if Plaintiff and the class ultimately prevail on

2  the question of liability, RESPA Section 8(d)(2) limits the damages to 15% of the

3  premium payable to FATIC.  Accordingly, Defendants, First American Financial

4  Corporation ("FAFC") and FATIC, are entitled to partial summary judgment on the

5  amount of damages.[1]

**FACTS**

**I.    Plaintiff And The Class's RESPA Claim**

    **A.    The Alleged Kickback And "Referral" Agreement**

    Plaintiff and the class assert one claim under RESPA Section 8(a):  that Defendants paid a kickback to Tower City in exchange for its agreement to "refer" title insurance underwriting to FATIC (Complaint ("Compl.") (Doc. 1) ¶¶ 2, 20, 25, 39).  Specifically, Plaintiff and the class claim that in 1998, Defendants overpaid for a 17.5% ownership interest in Tower City (*id.* ¶¶ 15-17).[2]  Thus, Plaintiff and the class claim that every class member who purchased a FATIC title insurance policy from Tower City between June 12, 2006 and November 9, 2006 was unlawfully "referred" to FATIC (*id.* ¶¶ 15-16, 19).  As proof of these alleged "referrals," Plaintiff and the class point only to the November 1, 1998, agency agreement between FATIC and Tower City, under which it allegedly "would exclusively refer all title insurance *underwriting* to [FATIC]" (*id.* ¶ 15 (emphasis added)).

    **B.    FATIC's And Tower City's Agency Relationship**

    Tower City was a licensed title insurance agent authorized to issue policies for FATIC (as well as for Stewart and Old Republic National Title Insurance Co.).  SUF

---

[1] Defendants concurrently have filed an unopposed motion to adjourn the hearing date and defer ruling on this motion for summary judgment until the expiration of the class notice process, as required by the one-way intervention rule.  *See Schwarzschild v. Tse*, 69 F. 3d 293, 295-96 (9th Cir. 1995).

[2] In fact, Defendants paid $2,000,000 for the purchase of the minority ownership interest, which represented fair value based on market factors, including the offer of a competitor, Stewart Title Guaranty Co. ("Stewart"), for an identical ownership interest (*see* Defs.' Mem. Opp. to Pl.'s Mtn. for Class Cert. (Doc. 256) at 9).

¶¶ 3, 16-19.  Pursuant to the FATIC-Tower City agency agreement, Tower City acted as FATIC's title agent "with respect to the transaction of the business of title insurance," including "rendering any or all of the following services":
(1) "[r]eceiving and processing applications for title commitments, title guarantees, judicial reports, guaranteed certificates of title, title insurance policies, endorsements, or other forms of title evidence approved by [FATIC] (the 'Approved Title Evidences');" and (2) "[i]ssuing the Approved Title Evidences [*e.g.*, title insurance policies] in accordance with the provisions of this Agency Agreement."  SUF ¶ 20.  FATIC also authorized Tower City to "sign, countersign, and issue . . . title guaranties and insurance policies" on behalf of FATIC.  SUF ¶ 21.  Further to this grant of authority, FATIC provided Tower City with various title insurance forms to issue on FATIC's behalf.  SUF ¶ 22 (FATIC "shall [f]urnish [Tower City] with all commitments, policies, endorsements and other contracts under which [FATIC] assumes liability for the condition of title").

Thus, under the agency agreement, FATIC granted Tower City the authority to bind FATIC on title policies issued by Tower City.  SUF ¶ 25 (FATIC shall "[a]ppoint [Tower City] in writing as a validating officer to countersign the forms issued to [Tower City]"); Syby Dec. ¶ 11 ("From June 12, 2006 through November 9, 2006, when Tower City performed title services . . . as an agent of FATIC, it did so under the terms of the 1998 Ohio Agency Agreement.").  Tower City's authority to act on behalf of FATIC was limited to policy issuance, *e.g.*, Tower City was not FATIC's agent for purposes of escrow or closing.  SUF ¶ 23.

FATIC required notification from Tower City of title insurance policies issued by it within 15 days after the month in which Tower City issued the policies.  SUF ¶ 26.  Under the agency agreement, Tower City retained, as its compensation for services performed issuing the policies (*see supra* at 3), 85% of the premiums paid for title insurance.  SUF ¶ 27.  Tower City was obligated to remit the remaining 15% to FATIC for underwriting the policies.  SUF ¶ 27.

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

SNR DENTON US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

## C.      Tower City's Issuance Of Title Insurance On Behalf Of FATIC

Plaintiff purchased a house on September 29, 2006 (eight years after the FATIC-Tower City acquisition and agency agreement), and Tower City was the title agent for her mortgage loan transaction.  SUF ¶¶ 1, 2, 5-15.  The premiums for Plaintiff's and the class members' title insurance policies were paid to Tower City, not to FATIC.  SUF ¶¶ 11, 12.  In Plaintiff's transaction, the charges for the owner's and lender's title insurance policies were allocated between her ($455.43) and her seller ($273.42).  SUF ¶ 10.[3]

Tower City issued FATIC owner's and lender's title insurance policies in Plaintiff's real estate transaction.  SUF ¶¶ 5, 6.[4]  Tower City likewise issued FATIC owner's and/or lender's policies in class members' real estate transactions that closed between June 12, 2006 and November 9, 2006.  SUF ¶ 7.  Tower City issued these owner's and lender's policies as an "officer or validating agent" of FATIC.  SUF ¶¶ 8, 9.  Aptly summarized by a former Tower City representative, in connection with Plaintiff's and the class's real estate transactions, "Tower City prepared and issued the FATIC title insurance policy on behalf of the insurer, FATIC, and remitted to FATIC its portion of the policy premium."  SUF ¶ 13.

In connection with her closing and the issuance of the FATIC title insurance policies, Plaintiff dealt only with Tower City, not with FATIC directly.  SUF ¶ 14.  The class members likewise dealt only with Tower City in the course of their real estate transactions.  SUF ¶ 15.[5]

---

[3] The class definition includes only "borrowers" and thus excludes sellers of real property such as Plaintiff's seller (*see* Court Minutes (Doc. 378) at 4), whom she previously asserted was in the class (*see* Pl.'s Opp. to Defs.' Mot. to Dismiss (Doc. 77) at 11).

[4] Title insurance protects the insured against losses caused by liens, encumbrances, or other defects in title to real property.  Joyce Palomar, Title Insurance Law § 1:8 (2012).  Title insurance policies protect either owners of real property ("owner's policies") or their lenders ("lender's policies").  *Id.* §§ 4:5, 4:8.

[5] Plaintiff and class members received disclosures from both FATIC and Tower City that they were affiliated entities.  SUF ¶ 29 ("Tower City Title Agency, LLC . . .

-4-

SNR DENTON US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

SNR DENTON US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

## II.    Defendants' Motion to Dismiss

Defendants previously have moved to dismiss, arguing, *inter alia*, that "there was no 'referral' for the purposes of RESPA" because "Section 2607(a) is violated only when there is a 'referral' in exchange for a thing of value, and there was no 'referral' in this instance" (Doc. 26 at 12).  Defendants noted that Plaintiff did not aver that Tower City "referred" her to another entity for the purchase of title insurance; rather, Tower City, "as a FATIC agent, sold her a policy" (*id.*).  Defendants further argued that Tower City's issuance of FATIC title insurance policies in Plaintiff's real estate transaction was not a "distinct service" from FATIC's underwriting of those policies, and therefore, Plaintiff had not alleged a "referral" required to state a claim under Section 8(a) (*id.* at 12-13).  The Court denied Defendants' motion but did not decide whether RESPA Section 8(a) applied to the underwriter-agent "transaction" to constitute a "referral" based on an agent's issuance of an underwriter's policy (Doc. 47 at 7).  The Court noted that a summary judgment motion on the "referral" issue was appropriate:  "Defendants' argument that no referral took place rests upon the facts outside of Edwards' Complaint and is better suited for argument in a motion for summary judgment" (*see* Doc. 47 at 7).  Accordingly, the "referral" issue is now ripe for decision by this Court.[6]

## ARGUMENT

## I.    Standard For Granting Summary Judgment

"Federal Rule of Civil Procedure 56(a) mandates that 'the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' Fed. R. Civ.

---

consists of Tower City Title Agency, Inc. and First American Title Insurance Company . . . .").

[6] The Ninth Circuit has not considered whether Tower City's issuance of policies underwritten by FATIC were "referrals" within the meaning of RESPA Section 8(a). The only issues before that Court have been whether Plaintiff had standing to sue and those relating to class certification, *see* Fed. R. Civ. P. 23(f).

P. 56(a). . . .  [W]hen the nonmoving party bears the burden of proving the claim or defense, the moving party does not need to produce any evidence or prove the absence of a genuine issue of material fact.  *See Celotex Corp. [v. Catrett]*, 477 U.S. [317,] 325 [(1986)].  Rather, the moving party's initial burden 'may be discharged by showing — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case.'  *Id.*"  *Fregoso v. Wells Fargo Dealer Servs.*, 2012 U.S. Dist. LEXIS 151785, at *5-6 (C.D. Cal. Oct. 16, 2012) (Otero, J.).

## II. Defendants Are Entitled To Summary Judgment Under RESPA Section 8(a) Because There Was No "Referral" By Tower City To FATIC.

### A. Under RESPA, The Issuance Of Title Insurance Is A Unitary Act By The Underwriter And Its Agent, Incapable Of Being "Referred."

#### 1. RESPA Section 8(a) And Regulation X

RESPA Section 8(a) provides that "[n]o person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan *shall be referred to any person*."  12 U.S.C. § 2607(a) (emphasis added); *see also* 24 C.F.R. § 3500.14(b) (same).  RESPA's implementing regulation ("Regulation X") provides:

> (1) A referral includes any oral or written action directed to a
> person which has the effect of affirmatively influencing the
> selection by any person of a provider of a settlement service
> or business incident to or part of a settlement service when
> such person will pay for such settlement service or business
> incident thereto or pay a charge attributable in whole or in
> part to such settlement service or business.  (2) A referral
> also occurs whenever a person paying for a settlement
> service or business incident thereto is required to use (see
> §3500.2, "required use") a particular provider of a settlement

SNR DENTON US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

SNR DENTON US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

service or business incident thereto.

24 C.F.R. § 3500.14(f).  "Required use means a situation in which a person must use a particular provider of a settlement service in order to have access to some distinct service or property . . . ."  *Id.* § 3500.2(b).[7]

RESPA further defines a "settlement service" to include "any service provided in connection with a real estate settlement including, but not limited to, the following: title searches, title examinations, the provision of title certificates, [and] title insurance."  12 U.S.C. § 2602(3).  Regulation X likewise defines a "settlement service" to include the "[p]rovision of title services, including title searches, title examinations, abstract preparation, insurability determinations, and the issuance of title commitments and title insurance policies."  24 C.F.R. § 3500.2(b).  Importantly, the regulation also provides that "[t]itle service means *any* service involved in the provision of title insurance (lender's or owner's policy), including but not limited to: title examination and evaluation; preparation and issuance of title commitment; clearance of underwriting objections; preparation and issuance of a title insurance policy or policies; and the processing and administrative services required to perform these functions."  *Id.* (emphasis added).

## 2.  Plaintiff And The Class's RESPA Claim Is Unsupported By The Statute.

RESPA's text, implementing regulations, history, and commentary all confirm that Plaintiff and the class's unprecedented theory is beyond the boundaries of Section 8(a).  For the purpose of that section, FATIC and Tower City were one and

---

[7] RESPA was administered and enforced by the Department of Housing and Urban Development ("HUD").  *See* 12 U.S.C. § 2617(a).  Since July 21, 2011, under the Dodd-Frank Wall Street Reform and Consumer Protection Act, *see* Pub. L. 111-203 (July 21, 2010), RESPA has been administered and enforced by the Consumer Financial Protection Bureau ("CFPB"), *see* Dodd-Frank Act § 1002(12)(M), (O), (14).  Regulation X and HUD's RESPA interpretations have been adopted by the CFPB.  *See* 12 C.F.R. Part 1024; CFPB Supervision & Examination Manual, Consumer Laws & Regulations, RESPA (Oct. 2012).

SNR DENTON US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1   the same provider of a single, unitary settlement service:  the issuance of title

2   insurance.

3          It is axiomatic that "the plain meaning of a statute controls where that meaning

4   is unambiguous," as is the case here.  *Khatib v. Cnty. of Orange*, 639 F.3d 898, 902

5   (9th Cir. 2011).  Section 8(a) imposes liability for a "referral," which necessarily

6   requires two distinct parties (other than the person being referred):  a referrer and a

7   referee.  *See, e.g.*, Black's Law Dictionary 1394 (9th ed. 2009) ("**referral**. (1927)

8   The act or an instance of sending or directing *to another* for information, service,

9   consideration, or decision . . . .") (emphasis added).  Coupled with the statute's

10  definition of a "title company" as "any institution which is qualified to *issue* title

11  insurance, directly *or through its agents*, and also refers to any duly authorized agent

12  of a title company," it is clear that RESPA does not consider the issuance of title

13  insurance by an underwriter through its agent something capable of being referred.

14  12 U.S.C. § 2602(4).  Rather, policy issuance is a unitary act by a single provider a,

15  "title company."  Indeed, the statute makes no distinction between an underwriter's

16  issuance of insurance directly or through an agent.  *See id.*  For the purposes of

17  RESPA, there is none.

18         Regulation X, in defining a "referral," likewise envisions "the direction of a

19  customer to a provider of a settlement service."  24 C.F.R. § 3500.14(f)(1).  As

20  evidenced by the Agency Agreement, FATIC and Tower City, when issuing title

21  insurance, were a single provider.  *See* SUF ¶¶ 20, 21.  Case law interpreting RESPA

22  further supports this conclusion, treating title underwriters and their issuing agents as

23  providers of a single settlement service when they issue title insurance.  *See, e.g.*,

24  *Arthur v. Ticor Title Ins. Co. of Fla.*, 569 F.3d 154, 159-60 (4th Cir. 2009);

25  *Hazewood v. Found. Fin. Grp.*, 551 F.3d 1223, 1226 (11th Cir. 2008); *Lang v. First*

26  *Am. Title Ins. Co. of N.Y.*, 816 F. Supp. 2d 214, 220-21 (W.D.N.Y. 2011) (collecting

27

28

cases).[8]  Additional RESPA jurisprudence emphasizes the requirement that two legally distinct parties exist for purposes of establishing liability.  *See, e.g.*, *Freeman v. Quicken Loans, Inc.*, 132 S. Ct. 2034, 2043 (2012); *Kruse v. Wells Fargo Home Mortg.*, 383 F.3d 49, 57-58 (2d Cir. 2004).

Moreover, as noted above, RESPA defines "settlement services" to include "title insurance" but does not further delineate "underwriting" and "issuance" as separate or distinct services.  *See* 12 U.S.C. § 2602(3).  This reinforces the notion that the issuance of a title policy is a unitary act of a title company, parts of which cannot be referred.  In contrast, RESPA lists other tasks performed by title agents -- like title searching and examination (which occur before a policy is issued, *see* Palomar § 1:15) -- as separate from the issuance of title insurance.  *See* 12 U.S.C. § 2602(3).

Similarly, Regulation X defines a "title service" (which, in turn, is a "settlement service") as "any service involved in the provision of title insurance (lender's or owner's policy), including but not limited to . . . preparation and issuance of a title insurance policy or policies."  24 C.F.R. § 3500.2(b).  That is, "title service" is defined to include *all* aspects of tile insurance issuance, and the phrase is singular not plural (*i.e.*, not "title serviceṣ").  Thus, it is not properly dissectible into microelements of separate settlement services (*e.g.*, underwriting and issuance), as Plaintiff and the class's claim requires (otherwise, there was nothing for Tower City to "refer" to FATIC).

Regulation X's other definition of a "referral" -- the "required use" of "a particular provider of settlement services" -- likewise presupposes the use of a third party for a separate, "*distinct* service," not the fulfillment of a single service (*e.g.*, a "title service"), whether directly or through an agent.  24 C.F.R. §§ 3500.2, 3500.14(f)(2).  That is, FATIC's standing behind the class members' title policies

---

[8] Ohio agency law is consistent in this regard as well.  *See infra* at 14.

SNR DENTON US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

SNR DENTON US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

was not "distinct" from Tower City issuing them.  *See* SUF ¶¶ 21, 25 (Tower City had the authority to bind FATIC on title policies)).

Regulation X's commentary, recognizing that the provision of a "title service" is a single continuum of tasks (here, necessarily involving Tower City and FATIC), also rejects the micro-parsing that Plaintiff and the class's Section 8(a) claim requires.  In both Regulation X and a separate policy statement, HUD stated that while the "preparation and issuance of the policy of title insurance" is a settlement service, an agent's acceptance of an order and placement of that order with an underwriter is not a *separate*, compensable service.  *See* 24 C.F.R. § 3500 App. B Nos. 3-4; HUD Statement of Policy 1996-4, Fed. Reg. 49,397, 49,399 (Sept. 19, 1996).  Thus, when an agent simply places or prepares an application with an underwriter, but does not issue a policy, the agent "performs minimal, if any, title services in connection with the issuance of the title insurance policy" and, therefore, may be liable under Section 8(a)'s referral prohibition.  24 C.F.R. § 3500 App. B Nos. 3-4.  But when an agent performs title services, including the "actual issuance of the policy or policies *on behalf of the title company*," the agent is not liable under Section 8.  *Id.* (emphasis added).  Importantly, by taking the position that an agent's placement of an order with an underwriter is not a *separate* settlement service, HUD necessarily recognized that an agent's issuance of an underwriter's policy could not constitute a "referral."  *See infra* at 12 (scholarly commentary reaching this very conclusion).[9]  Additionally, no agency or authority charged with the enforcement of RESPA (*i.e.*, HUD or the CFPB) has held a title insurer (or its agent) liable under

---

[9] HUD's interpretation on this point is entitled to deference.  *See, e.g.*, *Putnam Family P'ship v. City of Yucaipa*, 673 F.3d 920, 928 n.4 (9th Cir. 2012) ("Even if the appendix lacks the force of law and does not merit *Chevron* deference, it is HUD's interpretation of HUD's own regulation and is thus controlling unless plainly erroneous or inconsistent with the regulation.") (citation and quotations omitted); *Schuetz v. Banc One Mortg. Corp.*, 292 F.3d 1004, 1012 (9th Cir. 2002) ("*Chevron* deference is due even though HUD's Policy Statements are not the result of formal rulemaking or adjudication.").

Section 8(a) based on a theory that the agent "referred" something to its underwriter by issuing a title policy.

RESPA's legislative history is consistent with these regulatory interpretations. When enacting and amending RESPA, Congress considered title agents (*i.e.*, Tower City) and their underwriters (*i.e.*, FATIC) a singular unit to which title work could be referred by those outside the title industry (*e.g.*, closing attorneys, home builders, lenders, mortgage brokers, and realtors). *See* Pub. L. No. 93-533, 88 Stat. 1724 (Dec. 22, 1974); Pub. L. No. 98-181, 97 Stat. 1231 (Nov. 30, 1983). Indeed, the 1983 amendments to RESPA focused especially on referrals by these "outsiders" to title servicer providers, not on so-called "referrals" by title agents to their underwriters. *See, e.g.*, H.R. Rep. No. 97-532, at 51-56 (1982); *id.* at 53 ("In general, there are four categories of persons who are in a position to refer the settlement business of consumers in residential real estate transactions—real estate brokers and agents, mortgage lenders, real estate builders and developers, and attorneys."). Nowhere in this history did Congress consider the issuance of title insurance by an underwriter's agent anything other than a single service.

The leading treatise on title insurance also agrees that the issuance of title insurance is not capable of being "referred" between an agent and its underwriter. In *analyzing this case*, Professor Palomar concluded that "*an insurance agent's writing a policy on an insurance company is not a 'referral' of business under RESPA*." Palomar § 21:7 (emphasis added).[10] In reaching this conclusion, Professor Palomar aptly noted that an underwriter's network of agents is akin to wholesaler-retailer relationships. *Id.* Therefore, nothing is "referred" when an agent issues a policy, just as nothing is referred when an underwriter issues a policy directly. *Id.* (noting that underwriters distribute policies directly and through agents, which, for "referral"

---

[10] Professor Palomar has authored the Title Insurance Law treatise since 1994 and also is the co-author of Patton & Palomar on Land Titles. The section of her Title Insurance Law treatise analyzing this case and concluding that there is no actionable "referral" for purposes of RESPA Section 8(a) is attached as Exhibit A.

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

purposes, are indistinguishable); *see also id.* § 21:2 (discussing investigations concerning referrals by real estate agents, home builders, or lenders to title agents); Barron *et al.*, Fed. Regulation of Real Estate Mortg. Lending § 2:48 (2010) ("a statement by a broker that a borrower should use a particular title company would [be a referral]"); *id.* (discussing referrals by lenders to title agents or underwriters); Pannabecker & Stemler, The RESPA Manual:  A Complete Guide to the Real Estate Settlement Procedures Act § 3.03 (2010) (listing examples of potential Section 8(a) violations, none of which involves a title agent and its underwriter).

It also is notable how the semantics of Plaintiff's Complaint only underscore the incongruity between her and the class's RESPA theory and the statute's meaning. The Complaint interchangeably uses the phrases "title insurance," "underwriting," "issuance," and "title insurance business" to describe what, in reality, was the singular "title service" provided by Tower City to Plaintiff and each class member. For example, the Complaint describes "referrals" of "title insurance" and "title insurance business" by Tower City to FATIC (*see* Compl. ¶¶ 2, 20, 25, 29(c), (d)) but also states that Tower City "provided" Plaintiff and class members with "title insurance" (*see id.* ¶ 38, Wherefore ¶ A).  The Complaint further states that FATIC both "issues" title insurance and provides "underwriting" (*see id.* ¶¶ ¶¶ 8, 12, 14, 15, 17, 25, 29(a)) but also avers that Tower City issued Plaintiff and the class title insurance (*see id.* ¶ 38, Wherefore ¶ A).  The point is not semantics, rather, it is that "title insurance" cannot be parsed into the miniscule components necessary to support Plaintiff and the class's claim that, when issuing title policies, Tower City and FATIC did anything other than provide a single service.  *See* 12 U.S.C. § 2607(a).  And in doing so, they are a single provider.  Indeed, now that the case is beyond Plaintiff's allegations, the evidence is undisputed on these facts.  *See, e.g.*, SUF ¶¶ 13, 16-18 (describing the continuum of the issuance of title insurance by Tower City on behalf of FATIC).

SNR DENTON US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

In sum, because Tower City and First American provided a single settlement service (*i.e.*, title service), and were a single provider when issuing Plaintiff and the class members title policies, there was nothing capable of being "referred" for purposes of Section 8(a).

**B.   Tower City, As FATIC's Policy-Issuing Agent, Could Not "Refer" Anything To Its Principal.**

The absence of a "referral" by Tower City to FATIC is not only confirmed by RESPA but also by well-settled agency law.  As noted above, pursuant to the FATIC-Tower City agency agreement, Tower City was authorized to and did issue, on FATIC's behalf, the title policies in Plaintiff and class members' real estate transactions.  *See supra* at 4-5.  When Tower City issued those policies, as an "officer or validating agent" of FATIC, it immediately bound FATIC (as the underwriter of those policies), no differently than if FATIC had issued those policies directly.[11]  *See* Palomar § 21:7; *see also* FAFC Form 10-K (filed Feb. 27, 2012) ("A title insurance policy can be issued directly by a title insurer or indirectly *on behalf of* a title insurer through agents . . . .  Our agreements with our agents state the conditions under which the agent is authorized to issue title insurance policies *on our behalf*.") (emphasis added).[12]  Indeed, FATIC's only nexus to Plaintiff's and the class members' real estate transactions was *through* Tower City, and the charges for title insurance were payable to Tower City, not FATIC.  *See supra* at 4.  Even the Complaint acknowledged Tower City's authority to act *on behalf of* FATIC, as Plaintiff averred

---

[11] Under Ohio law, Tower City had the power to bind FATIC to the policies from the moment of issuance.  *See* Ohio Rev. Code § 3953.01(H) (defining a title insurance agent as a person or entity authorized to act for the underwriter).

[12] *Available at*:
http://quicktake.morningstar.com/stocknet/secdocuments.aspx?symbol=faf (last visited February 11, 2013).

SNR DENTON US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

that "FATIC issues title insurance policies directly and *through agents*" (Doc. 1 ¶ 8)
(emphasis added).[13]

Ohio law title insurance law considers title agents representatives of title
insurance companies when those agents issue policies.  Ohio Rev. Code
§§ 3953.01(A)-(C).  Thus, when Tower City, as a policy-issuing agent for FATIC,
issued title insurance to Plaintiff and the class, it was acting as a representative of
FATIC.  *See, e.g.*, *Orebaugh v. Wal-Mart Stores, Inc.*, 2007 WL 2758599, at *1
(Ohio App. 12 Dist. 2007) ("The act of the servant, done within the scope and in the
exercise of his employment, is in law the act of the master himself. . . .  This rule has
been recognized as legal unity of the principal and agent.") (citation and quotations
omitted).  As detailed above, a single, "unitary" transaction is not capable of being
"referred."

Several points of agency law further underscore this conclusion.  Of course, it
is axiomatic that a corporation, like FATIC, commonly acts through its authorized
agents like Tower City.  *See, e.g.*, *United States v. Graf*, 610 F.3d 1148, 1156 (9th
Cir. 2010); *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 419 (9th
Cir. 1977).  An agent's authorized act, in turn, binds the principal just as though the
principal had performed the act itself -- there is nothing "referred" when the agent
acts.  *See, e.g.*, Restatement (Third) of Agency § 6.01 ("When an agent acting with
actual or apparent authority makes a contract on behalf of a disclosed principal, (1)
the principal and the third party are parties to the contract; and (2) the agent is not a

---

[13] Further underscoring this point, in other cases, Plaintiff and the class's counsel
repeatedly have relied on the notion that a title agent *is* FATIC when issuing a policy,
consistently eschewing any suggestion that FATIC and its agents are anything other
than a single, non-distinct unit for the purpose of issuing title insurance.  *See, e.g.*,
Duvall Dec. ¶¶ 9-11 & Exs. E-G (*Scott v. First Am. Title. Ins. Co.*, Case No. 07-cv-
00052 (W.D. Ky.) (Doc. 38 at 8-13) (contending that FATIC is responsible for all
acts of its title agent because the agent acts on FATIC's behalf when issuing title
insurance)); *Mitchell-Tracey v. United Gen. Title Ins. Co.*, Case No. 05-cv-1428 (D.
Md.) (Doc. 30-2) (repeatedly claiming that FATIC issues title insurance policies
through its agents and is responsible for overcharging regardless of whether a title
agent or a FATIC employee issues the policy); *see also Amato v. United Gen. Title
Ins. Co.*, Case No. 08-cv-3423 (E.D. Pa.) (Doc. 24) (same))).

SNR DENTON US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

-14-

party to the contract unless the agent and third party agree otherwise."); *see also Orebaugh*, 2007 WL 2758599, at *1.

For similar reasons, it is legion that a principal cannot conspire with its agent for purposes of statutes like the Sherman Act, due to the common, unified interest of principal and agent. *See, e.g.*, *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769-70 (1984); *Jack Russell Terrier Network v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1034 (9th Cir. 2005); *Travelers Cas. & Sur. Co. Am. v. Desert Gold Ventures, LLC*, 2010 WL 546376, at *4 (C.D. Cal. Feb. 10, 2010) ("[A]n agent is not liable for conspiring with the principal when the agent is acting in an official capacity on behalf of the principal.") (citations and quotations omitted); *see also DeHorney v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 879 F.2d 459, 464 (9th Cir. 1989) (under state law, "agents and employees cannot conspire with their corporate principal or employer when they act in their official capacity"). And consistent with these agency doctrines, no court has treated an agent's sale of a principal's product (here, title insurance) as a "referral." *Cf. United States v. Parise*, 159 F.3d 790, 799-801 (3d Cir. 1998).

These principles of state and federal agency law underscore what the FATIC-Tower City agency agreement effected: Tower City's issuance of FATIC title insurance policies in Plaintiff's and the class members' real estate transactions had the same legal effect as if FATIC had issued the policies itself. Thus, there were no separate "referrals" between Tower City and FATIC when Tower City, as policy-issuing agent, issued those policies. *See also* Palomar § 21:7.[14] For this reason too, Tower City's issuance of FATIC policies in Plaintiff's and each of the class members' real estate transactions did not fall within the scope of Section 8(a).

---

[14] Of course, Plaintiff and the class's RESPA claim is even more attenuated as to FAFC, which is not a title insurance underwriter (*see* SUF ¶ 4).

SNR DENTON US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1    **III.    Alternatively, Defendants Are Entitled To Partial Summary Judgment On
2              The Issue Of Damages Because The Portion Of The Policy Premiums Owed
             To FATIC Was Only 15% Of That Charged By Tower City.**

3        If Plaintiff and the class are correct that Tower City somehow "referred"

4    something to FATIC, then the damages recoverable must be based on the charges for

5    the "referred" service (*i.e.*, underwriting the policy).  As a result, the measure of

6    damages available to Plaintiff and the class would not be based on the total charges

7    for title insurance but rather the portion of those charges owed to FATIC for

8    underwriting.

9        RESPA Section 8(d) (12 U.S.C. § 2607(d)) establishes liability based on "the

10   settlement service *involved in the violation*" and measures damages as three times

11   "the amount of any charge paid for *such settlement service*" (emphasis added).  As

12   noted above, RESPA defines "settlement service" to include title searches, title

13   examinations, and title insurance.  12 U.S.C. § 2602(3).

14       Also, as discussed above, the "settlement service involved in the violation"

15   claimed by Plaintiff and the class is FATIC's *underwriting* of title insurance policies,

16   *i.e.*, underwriting is what Tower City allegedly "referred" to FATIC.  The Complaint

17   itself states:

18              [FAFC] paid a kickback . . . in order to obtain an agency

19              agreement providing that Tower City would exclusively refer

20              all title insurance *underwriting* to [FATIC]. . . . [and]

21              Tower City referred insurance *underwriting* exclusively to

22              [FATIC].

23   Compl. ¶¶ 15, 17 (emphasis added); *see also supra* at 2-3.  Stated another way,

24   Plaintiff and the class do *not* claim that as a result of the alleged kickback

25   arrangement, they were "referred" to Tower City for the *issuance* of title policies.

26   Rather, they claim that Tower City selected FATIC -- rather than a competing

27   underwriter -- to issue the policies (*see, e.g.*, Compl. ¶ 20 (alleging that "[p]rior to the

28   kickback . . . Tower City referred substantial title insurance business to other title

SNR DENTON US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

-16-

insurance *underwriters*") (emphasis added)).  As a result, FATIC supposedly benefited from the alleged kickback arrangement by being owed 15% of policy premiums (to compensate FATIC for underwriting those policies).  *See supra* at 4.  Understood in the context of agency law, if Tower City could "refer" to FATIC, then the Tower City could not be considered FATIC's agent.  *See supra* at 13-16.  If Plaintiff and the class are correct in this regard, then FATIC should not be liable for Tower City's 85% portion of the policy premiums that was never FATIC's.

This measure of damages also would be consistent with other federal statutes.  For instance, in antitrust cases, the amount of the resulting overcharge -- not the entire amount of the product itself -- serves as the basis for calculating damages, because those damages must be a result of the anticompetitive conduct.  *See, e.g.*, *New York v Hendrickson Bros., Inc.*, 840 F.2d 1065, 1077 (2d Cir. 1988); *Dist. Cablevision Ltd. v. Bassin*, 828 A.2d 714, 730 (D.C. 2003) ("[W]hen a company is victimized by price-fixing, its damages that may be trebled are not the total price it paid, but rather the overcharge.") (citation omitted).  Here, the supposed result of the FATIC-Tower City kickback arrangement was that FATIC, not another underwriter, received title underwriting business.  Thus, it is only logical that the measure of damages under RESPA would be the amount to which FATIC was entitled for underwriting.[15]

Accordingly, if Defendants are not granted summary judgment on liability (*i.e.*, a "referral" occurred each time that Tower City issued a FATIC policy), then Plaintiff and the class cannot recover damages based on *both* FATIC's underwriting *and* Tower City's issuance of title insurance.  By example, if a class member was charged

---

[15] Permitting Plaintiff and the class to recover damages based on the entire title insurance charges also raises serious Due Process concerns.  *See, e.g.*, *Philip Morris USA v. Williams*, 549 U.S. 346, 353 (2007) (Due Process forbids excessive damage awards); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (same); *St. Louis, Iron Mountain & S. Ry. v. Williams*, 251 U.S. 63, 66 (1919) (observing that statutory damages are "essentially penal" and analyzing proportionality of those damages to harm).

SNR DENTON US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

-17-

$1,000, payable to Tower City, for title insurance, and Tower City remitted $150 to FATIC, then the measure of damages under RESPA Section 8(d)(2) would be based on $150 only.[16]

## CONCLUSION

For these reasons, Defendants respectfully request that the Court enter summary judgment on liability or, alternatively, partial summary judgment on damages against Plaintiff and the class.

Dated:  February 11, 2013                    Respectfully submitted,

                                             SNR Denton US LLP

                                             By   /s/  Michael J. Duvall
                                                         Michael J. Duvall

                                             Attorneys for Defendants

SNR DENTON US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

---

[16] The amount of each class members' claimed statutory damages is not yet known, as Plaintiff has yet to identify the class, much less the amount of their claimed damages (*see* Doc. 409).

# EXHIBIT A

Title Insurance Law
Database updated December 2012

Joyce Palomar

Chapter
21. Application of Real Estate Settlement Procedures Act to Title Agents and Title Insurance Underwriters

Correlation Table References

### § 21:7. Affiliated business exemption and disclosure requirements

To avoid RESPA's ban on the paying of rebates or kickbacks, numerous providers within the real estate settlement process form controlled or affiliated business arrangements.[1] An affiliated business arrangement exists when a real estate settlement service provider is partially owned by or affiliated with a person in a position to refer settlement services.[2] Title agents, title insurance companies, and attorneys are considered to be "in a position to refer settlement services," as are real estate brokers and agents, lenders, mortgage brokers, developers, and builders.[3] RESPA § 2607(c) exempts affiliated business arrangements from the prohibitions of §§ 2607(a) and (b), so long as: (4)(A) disclosure of the affiliated business arrangement and a written estimate of the provider's usual charges is given to the person being referred within a stated time period, which varies depending on the type of referrer and the means by which the referral is communicated;[4] (4)(B) the person being referred is *not required* to use the affiliated provider of settlement services,[5] and (4)(C) the only thing of value the referrer receives from the arrangement is a return on its ownership interest or franchise relationship, or other payments permitted under § 2607(c).[6]

The "affiliated business" exception in § 2607(c)(4)(C) permits the referrer only a bona fide return on its ownership interest.[7] It will not apply if payments to the referrer are calculated on the basis of the amount of referrals made, whether directly or indirectly. HUD's RESPA Statement of Policy 1996-2 gives several examples of the factors HUD will apply when assessing whether a payment is a bona fide return on ownership interest or really a payment for referrals of settlement service business.[8]

An exception to the rule in § 2607(c)(4)(B) that the person being referred cannot be *required* to use the affiliated settlement service provider is made for an attorney or law firm that represents a client in a residential real estate transaction and orders title insurance for its client as a title insurance agent or through a separate corporate title insurance agency operated by the attorney or law firm as an adjunct to its law practice.[9] This exception allows for bar-related title insurance and attorney-owned title guaranty companies,[10] which are described in §§ 2:1 et seq. of this treatise.

After finding that several supposed affiliated arrangements were shams devised as a "subterfuge for passing referral fees back to the referring party," HUD added a fourth requirement via its RESPA Statement of Policy 1996-2,[11] *i.e.*, the exemption is only available to a "*bona fide* provider" of settlement services.[12] HUD's RESPA Statement of Policy 1996-2 lists 10 factors that HUD will weigh in determining whether a party is a bona fide provider or a mere sham set up as a conduit for referral fees.[13]

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

To meet § 2607(c)'s disclosure requirements, any title insurance agent, real estate agent, mortgage broker, mortgage lender or builder who has a financial interest in or ongoing business relationship with another title insurance company, mortgage lender, or real estate agent involved in the transaction and who directly or indirectly refers a home purchaser or seller to their affiliate must inform both the purchaser and the seller, in writing, of the connection between the two companies.[14]

HUD provides a sample format to be used to disclose a controlled business arrangement to the home buyer and seller.[15] The form requires a description of the nature of the relationship, including ownership and financial interests, as well as the estimated charges for relevant settlement services. Most importantly, the disclosure should contain the following statements:

You are not required to use the listed provider(s) as a condition for [settlement of your loan on] [or] [purchase or sale of] the subject property. You may be able to get these services at a lower rate by shopping with other settlement services providers.[16]

The disclosure must be on a distinct sheet of paper, not merely added on to the HUD-1 statement or other documents.[17] Generally, the disclosure should be delivered when the referral is made, in the case of a written, electronic, or face-to-face referral, and within three business days after a telephone referral.[18] When a lawyer or law firm requires the use of an affiliated title insurance agency, however, they must give the affiliated-business disclosure at the time that the attorney is retained.[19] The referrer should ask the home buyer or seller for a written receipt of the disclosure at least by the time of settlement.[20]

Nondisclosure and failure to give buyers and sellers a choice in selecting the necessary service providers may result in penalties.[21] On October 7, 1992, Equity Title, a Minnesota title company, Edina Realty, Inc., a large brokerage firm, and a major lender entered into a settlement agreement with HUD after being threatened with prosecution under RESPA for allegedly referring business to one another without disclosing their affiliation.[22] Equity, Edina, and the lender promised to include prominent, printed disclosures on all home-listing contracts and "good-faith" settlement cost estimate forms to advise clients of their affiliation. They also promised their future disclosures would make clear that clients are free to use any firm they wish for title searches, closings or financing and are under no obligation to employ any of the affiliated firms. Finally, the parties agreed to instruct employees that they were not required to refer clients to one of the affiliated companies for title work, financing, or other settlement services and that they would not be penalized for referring clients to other companies.

In May of 2003, HUD settled a suit against 13 New York attorneys who HUD alleged were improperly steering business to the title agency where they were principal shareholders. Prosecutors contended that the attorneys violated RESPA by receiving payments based on the volume of clients they referred to Covenant Abstract Co. Inc. The complaint alleged that the attorneys therefore violated the requirement that a referrer to an affiliate must receive no pay for the referral except what is collected in dividends based on their ownership interest in the affiliate.

A person who can establish by a preponderance of the evidence that he or she unintentionally violated § 2607(c) is not liable.[23] Such person must establish that the violation occurred because of a "*bona fide* error," and that at the time of the error, reasonable procedures existed to avoid such errors.[24]

***Exclusive Insurance Agencies***

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

In *Edwards v. First American Corp.*,[25] class action plaintiffs raised three questions that neither RESPA nor HUD expressly address: (1) Is a title insurance agent's writing a policy on an insurance company a "referral"? (2) Is a title insurance company's payment to purchase an ownership interest in an agency that thereafter acts as a primarily exclusive agent for that insurer a "fee for referrals?" (3) Should the affiliated business exemption apply only when an owner "refers" business to an owned/controlled settlement service provider, and not when an owned/controlled settlement service provider "refers" business to its owner?

It seems to this author that an insurance agent's writing a policy on an insurance company is not a "referral" of business under RESPA, for reasons discussed below. If these acts are deemed "referrals," then RESPA and/or Regulation X should be amended so that the affiliated business exemption clearly is applicable when the owner is a "referee" of business and not only a "referrer."

Title insurance, property-liability insurance, life insurance and other lines of insurance commonly are distributed through either "direct writing" or independent agency models.[26] "The direct writer category encompasses mass marketing, the use of employee sales agents, and exclusive agents. The independent agency category encompasses both the independent agency system of marketing" and, in some insurance lines, the use of insurance brokers.[27]

*Referrals?* General insurance law considers an agent to be serving the customer both when taking the customer's insurance order and placing it with an insurer.[28] HUD actually also treats an agent's taking a title insurance order from a customer and writing the policy or placing the order as one service.[29] Reg X Appendix B Illustrations 3 & 4 and HUD's Statement of Policy 1996-4 say that a title insurance agent does not perform a separate service entitling it to any premium when taking the homebuyer's order and placing it with an insurer. Illustration 3 states "A[gent] performs minimal, if any, title services in connection with the issuance of the title insurance policy (such as placing an application with the title company)." HUD's Comment to Illustration 3 concludes that taking a title insurance order and placing an application with the title insurance company are not separate services warranting payment of any commission.[30] Similarly in Illustration 4,[31] HUD says the agent's preparing and forwarding title insurance applications to the insurance company are not separate title work for which the agent can be compensated. Further, in HUD Statement of Policy 1996-4, though "preparation and issuance of the policy of title insurance" is a title service, accepting and placing a title insurance order for a customer is not a title service warranting payment. HUD concludes in Illustrations 3 and 4 and Statement of Policy 1996-4 that, because an agent's placing a customer's order for a policy is not a distinct service for the insurer, if that is all the agent did, then any payment the insurer gave the agent actually must have been for something else–a referral. But is HUD necessarily saying that an insurance agent's writing or ordering a policy *is* a referral? If HUD were saying that, wouldn't it also be a "referral" when a property insurance agent places a homebuyer's property insurance order with the agent's principal?

*Payment for referrals?* Commissions for title agents' actual services performed in the issuance of a policy will not be considered payment for referrals according to RESPA § 2607(c)(1)(B).[32] Plaintiffs in *Edwards v. First American Corp.* allege that the unlawful payment for referrals, instead, was the price the insurer paid for a partial ownership interest in the agency.[33] RESPA § 2607(c)(2) assures, however, that payment for goods or facilities actually furnished and services actually performed will not violate RESPA. Therefore, to find the insurer paid anything for referrals in *Edwards*, the court would have to find the price paid to purchase the ownership interest in the agency was significantly more than the value of the economic benefits the insurer intended to obtain from the ownership interest. This author speculates that, in general, benefits from a title insurer's purchasing a local title agency might include the value of the agency as a going concern, local advertising, lowering

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

of the insurer's costs due to lower commissions to exclusive agents,[34] lower claims due to the insurer's ability to provide consistent education and resources to the local agency, and increased distribution of the insurer's policies. If the plaintiffs in *Edwards* object to considering the value of increased distribution of the insurer's policies when determining the purchase price for the interest in a title agency, shouldn't they answer how that is different than any other producer of goods considering the value of increased distribution of its goods when purchasing a local distributor? For example, when determining the purchase price for a local coffee shop, would not Starbucks consider the amount of Starbucks coffee it hopes to sell out of that location? Similarly, would not Krogers' determination of the purchase price for a local grocery store include the value of Krogers brand goods they may sell out of that location?

*Affiliated Business Exemption?* When an insurance company buys a partial interest in an agency that sells the insurer's policies, a layperson would consider the two businesses to be affiliated, but these facts do not fit squarely into RESPA's "affiliated business arrangement" definition at 12 U.S.C.A. § 2602(7)(a). According to this definition, the affiliated business exemption[35] expressly applies only when an owner[36] or one in an affiliate relationship is in a position to refer business to an owned-provider; the allegation in *Edwards v. First American Corp.* is the opposite, *i.e.,* that the owned-agent "referred" business to the owner-insurer. HUD's definition of "affiliate relationship" in Reg X explains that one entity may have control over the other by virtue of a partnership or other agreement, or the entities may be under common control, or one entity may be a parent corporation and the other a subsidiary.[37] But this does not seem to enlarge the exemption's application to situations other than when the entity owning or controlling is the "referrer" of business to the owned or controlled entity. Therefore, if a court or HUD were to deem an agent's ordering or writing insurance on an insurer's policy to be a "referral," then the affiliated business exemption also should be amended to apply whether it is the owning or owned business that makes "referrals." So long as the affiliated business exemption's disclosure conditions are met, it is difficult to see a reason to not make the exemption available and, instead, assess treble damages, if an owned business makes an alleged "referral" to its owner.

Furthermore, insurance experts consider sales by exclusive agents to be "direct writing" like sales by employee agents.[38] Reg X expressly permits payments by an employer for its employees' referrals.[39] So long as the exclusive agent's relationship with the insurer is disclosed pursuant to § 2607(c)(4), why should an exclusive agency's writing policies for an insurer be treated so differently than an insurer's employee writing the insurer's policies? While many distinctions exist between other insurance lines and title insurance,[40] enough similarities in the insurance distribution models exist that an insurer's acquiring a partial interest in an exclusive agency should not result in an assessment of treble damages without prior study of the costs and inefficiencies that could result and an express statement by HUD.

---

[FN1] O'Hara, Controlled Business Arrangements Concern Title Insurance Companies, 202 N.Y.L.J. 44 (1989):
It is generally acknowledged that the growth of these controlled business title agencies was caused by the prohibition on the payment and receipt of rebates or commissions for the referral of title insurance business, and other closing services, contained in § 8 [§ 2607] of the Real Estate Settlement Procedures Act (RESPA), enacted in 1974.

[FN2] Toldy v. Fifth Third Mortg. Co., 721 F. Supp. 2d 696 (N.D. Ohio 2010); Wyman v. Park View

Federal Sav. Bank, 2010 WL 4868120 (N.D. Ohio 2010); Robinson v. Fountainhead Title Group Corp., 252 F.R.D. 275, 284-285 (D. Md. 2008), on reconsideration, R.I.C.O. Bus. Disp. Guide (CCH) P 11658, 2009 WL 539882 (D. Md. 2009), subsequent determination, 257 F.R.D. 92 (D. Md. 2009); Benway v. Resource Real Estate Services, LLC, 239 F.R.D. 419 (D. Md. 2006); Gardner v. First American Title Ins. Co., 296 F. Supp. 2d 1011 (D. Minn. 2003); 12 U.S.C.A. § 2602(7):

(a) A person who is in a position to refer business incident to or a part of a real estate settlement service involving a federally-related mortgage loan, or an associate of such person, has either an affiliate relationship or a direct or beneficial ownership interest of more than 1 percent in a provider of settlement services; and (b) Either of such persons directly or indirectly refers such business to that provider or affirmatively influences the selection of that provider.


[FN3] 24 C.F.R. § 3500.15(c)(9).

[FN4] 12 U.S.C.A. § 2607(c):

Nothing in this section shall be construed as prohibiting … (4) affiliated business arrangements so long as (A) a disclosure is made of the existence of such an arrangement to the person being referred and, in connection with such referral, such person is provided a written estimate of the charge or range of charges generally made by the provider to which the person is referred (i) in the case of a face-to-face referral or a referral made in writing or by electronic media, at or before the time of the referral (and compliance with this requirement in such case may be evidenced by a notation in a written, electronic, or similar system of records maintained in the regular course of business; (ii) in the case of a referral made by telephone, within 3 business days after the referral by telephone, (and in such case an abbreviated verbal disclosure of the existence of the arrangement and the fact that a written disclosure will be provided within 3 business days shall be made to the person being referred during the telephone referral); or (iii) in the case of a referral by a lender (including a referral by a lender to an affiliated lender), at the time the estimates required under section 5(c) are provided (notwithstanding clause (i) or (ii)); and any required written receipt of such disclosure (without regard to the manner of the disclosure under clause (i), (ii), or (iii)) may be obtained at the closing or settlement (except that a person making a face-to-face referral who provides the written disclosure at or before the time of the referral shall attempt to obtain any required written receipt of such disclosure at such time and if the person being referred chooses not to acknowledge the receipt of the disclosure at that time, that fact shall be noted in the written, electronic, or similar system of records maintained in the regular course of business by the person making the referral), (B) such person is not required to use any particular provider of settlement services, and (C) the only thing of value that is received from the arrangement, other than the payments permitted under this subsection, is a return on the ownership interest or franchise relationship, …. For purposes of the preceding sentence, the following shall not be considered a violation of clause (4)(B): (i) any arrangement that requires a buyer, borrower, or seller to pay for the services of an attorney, credit reporting agency, or real estate appraiser chosen by the lender to represent the lender's interest in a real estate transaction, or (ii) any arrangement where an attorney or law firm represents a client in a real estate transaction and issues or arranges for the issuance of a policy of title insurance in the transaction directly as agent or through a separate corporate title insurance agency that may be established by that attorney or law firm and operated as an adjunct to his or its law practice.


See also 24 C.F.R. § 3500.15; Carter v. Welles-Bowen Realty, Inc., 719 F. Supp. 2d 846, 855 (N.D. Ohio 2010).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN5] "Required use" is defined at 24 C.F.R. § 3500.2. *See* Carter v. Welles-Bowen Realty, Inc., 719 F. Supp. 2d 846, 855 (N.D. Ohio 2010).

[FN6] 12 U.S.C.A. § 2607(c). *See* Carter v. Welles-Bowen Realty, Inc., 719 F. Supp. 2d 846, 855 (N.D. Ohio 2010); Ngwa v. Castle Point Mortg., Inc., 2008 WL 3891263 (S.D. N.Y. 2008) (holding that since there was no evidence of any compensation to Castle Point other than through ownership in Royal, the affiliated business exception was met and defendants' motion to dismiss should be granted); Pettrey v. Enterprise Title Agency, Inc., 241 F.R.D. 268, 274–275 (N.D. Ohio 2006), appeal dismissed, 584 F.3d 701 (6th Cir. 2009); Robinson v. Fountainhead Title Group Corp., 252 F.R.D. 275, 285 (D. Md. 2008), on reconsideration, R.I.C.O. Bus. Disp. Guide (CCH) P 11658, 2009 WL 539882 (D. Md. 2009), subsequent determination, 257 F.R.D. 92 (D. Md. 2009); Gardner v. First American Title Ins. Co., 2003 WL 221844, *2 (D. Minn. 2003); Gardner v. First American Title Ins. Co., 296 F. Supp.2d 1011 (D. Minn. 2003).

[FN7] Gardner v. First American Title Ins. Co., 296 F. Supp.2d 1011 (D. Minn. 2003).

24 C.F.R. § 3500.15(b)(3). *See also* Illustration 10 at 24 C.F.R. § 3500 Appendix B exemplifying unlawful referral fees through a shell company and Statement of Policy 1996-2, Regarding Sham Controlled Business Arrangements, 61 Fed. Reg. 29,258 (June 7, 1996).

[FN8] Statement of Policy 1996-2, Regarding Sham Controlled Business Arrangements, 61 Fed. Reg. 29,258 (June 7, 1996).

[FN9] 24 C.F.R. § 3500.15(b)(2).

[FN10] A second exception is for a lender that requires a particular attorney, credit reporting agency, or real estate appraiser, to represent the lender's interest in a residential real estate transaction. 24 C.F.R. §§ 3500.15(b)(2) and 3500.7(e)(3). This exception does not apply to lender's referrals to title insurance agents or underwriters. Neither exception is available if the ABA is not a "*bona fide* provider of settlement services" under the HUD 10-factor analysis or fails to meet one of the three conditions under § 2607(c)(4). *Compare* Robinson v. Fountainhead Title Group Corp., 252 F.R.D. 275, 285 (D. Md. 2008), on reconsideration, R.I.C.O. Bus. Disp. Guide (CCH) P 11658, 2009 WL 539882 (D. Md. 2009), subsequent determination, 257 F.R.D. 92 (D. Md. 2009) and Pettrey v. Enterprise Title Agency, Inc., 241 F.R.D. 268, 275 (N.D. Ohio 2006), appeal dismissed, 584 F.3d 701 (6th Cir. 2009) *with* Gardner v. First American Title Ins. Co., 2003 WL 221844, *2 (D. Minn. 2003).

[FN11] Statement of Policy 1996-2, Regarding Sham Controlled Business Arrangements, 61 Fed. Reg. 29,258 (June 7, 1996).

[FN12] Robinson v. Fountainhead Title Group Corp., 252 F.R.D. 275, 285 (D. Md. 2008), on reconsideration, R.I.C.O. Bus. Disp. Guide (CCH) P 11658, 2009 WL 539882 (D. Md. 2009), subsequent determination, 257 F.R.D. 92 (D. Md. 2009) (an ABA that is not a "*bona fide* provider of settlement services" under the HUD 10-factor analysis or that fails to meet any of the three conditions set forth under Section 8(c)(4) is not otherwise eligible for the exemptions under section 8(c)"); Pettrey v. Enterprise Title Agency, Inc., 241 F.R.D. 268, 274-275 (N.D. Ohio 2006), appeal dismissed, 584 F.3d 701 (6th Cir. 2009); Gardner v. First American Title Ins. Co., 296 F. Supp. 2d 1011, 1017 n.7 (D. Minn. 2003).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN13] Robinson v. Fountainhead Title Group Corp., 252 F.R.D. 275, 285 (D. Md. 2008), on reconsid-
eration, R.I.C.O. Bus. Disp. Guide (CCH) P 11658, 2009 WL 539882 (D. Md. 2009), subsequent de-
termination, 257 F.R.D. 92 (D. Md. 2009); Pettrey v. Enterprise Title Agency, Inc., 241 F.R.D. 268,
275 (N.D. Ohio 2006), appeal dismissed, 584 F.3d 701 (6th Cir. 2009); Benway v. Resource Real Estate
Services, LLC, 239 F.R.D. 419, 423 (D. Md. 2006); Gardner v. First American Title Ins. Co., 2003 WL
221844, *2 (D. Minn. 2003), citing Statement of Policy 1996-2, Regarding Sham Controlled Business
Arrangements, 61 Fed. Reg. 29,258 (June 7, 1996):

HUD weighs ten factors in determining whether an affiliated business arrangement is a "bona fide" or
"sham" service provider: (1) does the entity have sufficient initial capital and net worth; (2) is the entity
staffed with its own employees; (3) does the entity manage its own business affairs; (4) does the entity have
a separate office; (5) are substantial services provided by the entity; (6) does the entity perform substantial
services by itself; (7) if the entity contracts out services, are they from an independent company; (8) if the
entity contracts out work to another party, is the party performing any contracted services receiving a pay-
ment for services of facilities provided that bears a reasonable relationship to the value of the services or
goods received; (9) is the new entity actively competing in the marketplace for business; and (10) is the en-
tity sending business exclusively to one of the settlement providers that created it. HUD-s 10-factor test was
held to be unconstitutional due vagueness, however, by the Federal District Court for the Northern District
of Ohio in Carter v. Welles-Bowen Realty, Inc., 719 F.Supp.2d 846 (N.D.Ohio, 2010) ("vagueness of the in-
dividual factors is compounded by the subjective balancing process inherent in the test").


[FN14] 24 C.F.R. § 3500.15.

[FN15] 24 C.F.R. Part 3500 Appendix D.

[FN16] 24 C.F.R. Part 3500 Appendix D.

[FN17] 24 C.F.R. § 3500.15(b)(1); Toldy v. Fifth Third Mortg. Co., 721 F. Supp. 2d 696, 709–710
(N.D. Ohio 2010); Wyman v. Park View Federal Sav. Bank, 2010 WL 4868120 (N.D. Ohio 2010).

[FN18] 24 C.F.R. § 3500.14(c).

[FN19] 24 C.F.R. § 3500.15(b)(1)(ii).

[FN20] 12 U.S.C.A. § 2607(c)(4)(A).

[FN21] See Harney, The Nation's Housing—Agents Must List Links to Lenders, Title Firms, Wash.
Post, Oct. 17, 1992, E12.

[FN22] See Harney, The Nation's Housing—Agents Must List Links to Lenders, Title Firms, Wash.
Post, Oct. 17, 1992, E12.

[FN23] 12 U.S.C.A. § 2607(d)(3).

[FN24] 12 U.S.C.A. § 2607(d)(3).

[FN25] After deciding standing and class certification issues, the Ninth Circuit Court of Appeals in
2010 remanded the Edwards case back to the U.S. District Court for the Central District of California

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

for a decision on this issue. *See* Edwards v. The First American Corp., 385 Fed. Appx. 629 (9th Cir. 2010) and Edwards v. First American Corp., 610 F.3d 514 (9th Cir. 2010), certiorari granted in part, 131 S. Ct. 3022, 180 L. Ed. 2d 843 (2011) and cert. dismissed as improvidently granted, 132 S. Ct. 2536, 183 L. Ed. 2d 611 (2012).

[FN26] L. Regan and S. Tennyson, *Insurance Distribution Systems*, in G. Dionne, HANDBOOK OF INSURANCE, § 22.3, p. 719 (2001).

[FN27] L. Regan and S. Tennyson, *Insurance Distribution Systems*, in G. Dionne, HANDBOOK OF INSURANCE, § 22.3, p. 719 (2001) (emphasis added).

[FN28] *See generally* Couch on Insurance §§ 45:1, 45:8 & 45:21.

[FN29] 12 U.S.C.A. § 2602(3).

[FN30] *See* additional discussion of Illustration 3 *supra* § 21:3.

[FN31] *See* additional discussion of HUD's Illustration 4 *supra* § 21:3.

[FN32] 12 U.S.C.A. § 2607:

c) Nothing in this section shall be construed as prohibiting (1) the payment of a fee (A) to attorneys at law for services actually rendered or (B) by a title company to its duly appointed agent for services actually performed in the issuance of a policy of title insurance or … (2) the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed …

*See also* discussion of core title agent services *supra* § 21:3.

[FN33] Edwards v. First American Corp., 517 F. Supp. 2d 1199 (C.D. Cal. 2007), aff'd in part, rev'd in part on other grounds, 610 F.3d 514 (9th Cir. 2010), certiorari granted in part, 131 S. Ct. 3022, 180 L. Ed. 2d 843 (2011) and cert. dismissed as improvidently granted, 132 S. Ct. 2536, 183 L. Ed. 2d 611 (2012). *Edwards* further alleges that agreeing in the purchase contract that the agent subsequently will write insurance primarily for that insurer is the unlawful "agreement to refer."

[FN34] Empirical studies in the context of property-liability insurance consistently find that insurers using the independent agency distribution system have higher costs than those using "direct writing, " which encompasses mass marketing, employee sales agents, and exclusive agents. L. Regan and S. Tennyson, *Insurance Distribution Systems*, in G. Dionne, HANDBOOK OF INSURANCE, § 22.3, p. 719 (2001). "The one unquestioned conclusion arising from this literature is that in property-liability insurance direct writers have lower underwriting costs on average than independent agency insurers." Ibid. at 722. One reason is that it is typical to pay a lower commission to tied agents and a higher commission to independent agents, L. Regan and S. Tennyson, *Insurance Distribution Systems*, in G. Dionne, HANDBOOK OF INSURANCE, § 22.2.1.2, p. 714 (2001).

[FN35] 12 U.S.C.A. § 2607(c)(4).

[FN36] 12 U.S.C.A. § 2602(7)(A) … "a person who is in a position to refer business incident to or a part of a real estate settlement service … has either an affiliate relationship with or a direct or beneficial

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

ownership interest of more than 1 percent in a provider … and (B) refers such business to that provider or affirmatively influences the selection of that provider…."

[FN37] 24 C.F.R. § 3500.15(c)(2). HUD presumes control when one entity owns more than 20% of the voting interests of another. 24 C.F.R. § 3500.15(c)(4)(ii).

[FN38] L. Regan and S. Tennyson, *Insurance Distribution Systems*, in G. Dionne, HANDBOOK OF INSURANCE, p. 712 & 719 (2001).

[FN39] 24 C.F.R. § 3500.14(g)(1)(vii). *See generally* McCullough v. Howard Hanna Co., 2010 WL 1258112 (N.D. Ohio 2010). HUD intends this clause to exempt those referrals by employees that are not sufficiently distinct from the action of the employer to provide the plurality of actors needed to violate § 2607. *See* 57 Fed. Reg. 49,600.

[FN40] *See* discussion *infra* Chapter 1.

Westlaw. © 2012 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

TITLEINSL § 21:7

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.